XL SPECIALTY INSURANCE COMPANY; National Union Fire Insurance Company of Pittsburgh, PA; Columbia Casualty Company; Axis Insurance Company; Ace American Insurance Company; Arch Insurance Company; RSUI Indemnity Company; Chartis Property Casualty Company, Formerly known as "AIG Casualty Company"; Houston Casualty Company; Those Certain Underwriters at

Lloyd's London Subscribing to Policy No. B0509QA027908, also known as "Lloyd's Underwriter Syndicate No. 2488 AGM London"; and Scottsdale Indemnity Company, Defendants Below, Appellants,

v.

WMI LIQUIDATING TRUST, Plaintiff Below, Appellee.

No. 449, 2013.

Supreme Court of Delaware.

Submitted: March 5, 2014.

Decided: May 28, 2014.

Edward M. McNally and Patricia A. Winston, Esquires, Morris James LLP, Wilmington, Delaware for Appellants National Union Fire Insurance Company of Pittsburgh, PA and Chartis Property Casualty Company.

Thomas G. Macauley, Esquire, Macauley LLC, Wilmington, Delaware and Charles C. Lemley (argued) and John E. Howell, Esquires, Wiley Rein LLP, Washington, DC for Appellants XL Specialty Insurance Company and Columbia Casualty Company.

Joseph H. Huston, Jr., Esquire, Stevens & Lee, Wilmington, Delaware and Michael R. Goodstein, Bailey Cavalieri LLC, Columbus, Ohio for Appellants RSUI Indemnity Company and Scottsdale Indemnity Company.

Howard A. Cohen, Esquire, Drinker Biddle & Reath LLP, Wilmington, Delaware for Appellant Houston Casualty Company.

Francis J. Murphy and Kelley M. Huff, Esquires, Murphy & Landon, Wilmington, Delaware for Appellants Arch Insurance Company; Ace American Insurance Company; and Those Certain Underwriters at Lloyd's, London, Subscribing to Policy No. B0509QA027908.

Kim W. West and Alec H. Boyd, Esquires, Clyde & Co U.S. LLP, San Francisco, California for Appellant Arch Insurance Company.

Ralph A. Gurgis and Sean R. Simpson, Esquires, Sedgwick LLP, Irvine, California for Appellants Ace American Insurance Company; and Those Certain Underwrit-

ers at Lloyd's, London, Subscribing to Policy No. B0509QA027908.

Timothy Jay Houseal, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware and Ommid C. Farashahi, Michael T. Skoglund and Brian J. Watson, Esquires, Bates Carey Nicolaides, LLP, Chicago, Illinois for Appellant AXIS Insurance Company.

Paul D. Brown, Joseph B. Cicero, and Ann M. Kashishian, Esquires, Cousins Chipman & Brown, LLP, Wilmington, Delaware and David M. Stern (argued), Lee R. Bogdanoff, Daniel J. Bussel, and Matthew C. Heyn, Esquires, Klee, Tuchin, Bogdanoff & Stern LLP, Los Angeles, California for Appellee WMI Liquidating Trust.

Before STRINE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices.

JACOBS, Justice:

## I. INTRODUCTION

Before us is a dispute about whether coverage exists under certain management liability insurance policies. A bankruptcy trust seeks a determination that those insurance policies cover potential future expenses and liabilities that might arise out of pre-bankruptcy wrongful acts allegedly committed by the insured debtor company's directors and officers. XL Specialty Insurance Company ("XL Specialty") and certain excess insurance carriers, who are the defendants-below/appellants, appeal from a Superior Court order denying their motion to dismiss the action. They claim that the plaintiff-below/appellee, WMI Liquidating Trust (the "Trust") lacks standing to prosecute its coverage claims, and, moreover, that the dispute does not present a ripe "actual controversy" susceptible of adjudication.

Because we hold that the Trust's complaint must be dismissed on ripeness grounds, we do not reach the issue of standing. The parties' dispute is not ripe because it has not yet assumed a concrete or final form. Therefore any judicial resolution at this stage would necessarily be based on speculation and hypothetical facts, and ultimately could prove unnecessary. Accordingly, we reverse the Superior Court judgment and remand the case with instructions to dismiss the Trust's complaint without prejudice.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

#### (1) The Parties

The plaintiff Trust is a Delaware statutory trust that is the legal successor to the bankruptcy debtor, Washington Mutual, Inc. ("WMI"). In September 2008, WMI filed for bankruptcy. The Trust succeeded to the assets of WMI's bankruptcy estate and to the claims asserted by the Official Committee of Unsecured Creditors of Washington Mutual, Inc., et al. (the "Creditors Committee").[1] The Trust was formed after WMI's Seventh Amended Joint Plan of Affiliated Debtors[2] was confirmed by order dated February 23, 2012.

The defendants-below/appellants (collectively, the "Defendants" or "Insurers") are insurance companies that issued management liability insurance policies to WMI covering the period May 1, 2008 to May 1, 2009.

#### (2) The Downstream Transaction and the Resulting Claim

On September 10, 2008, certain WMI directors and officers (the "D & Os") allegedly caused WMI to make a $500 million "downstream" capital contribution to Washington Mutual Bank ("WMB"),[3] ostensibly to help alleviate WMB's acute liquidity crisis. That downstream transaction proved futile: two weeks later, the Office of Thrift Supervision seized WMB, and on September 26, 2008, WMI filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Chapter 11 of the United States Bankruptcy Code.[4]

By letter dated April 27, 2009, the Creditors Committee notified the D & Os of its belief that the D & Os "[had] engaged in certain wrongful acts [including the downstream transaction] that have injured the Debtors [including WMI], the Debtors' estates, and the creditors of the estates, and may result in claims for money damages."[5] On October 13, 2011, WMI (as the debtor in possession) and the Creditors Committee followed up by sending to the D & Os a "Demand Letter" asserting a claim against the D & Os for losses arising out of the September 2008 downstream transaction (the "Asserted Claim").[6] Specifically, the

---

**1.** WMI's bankruptcy estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case," including WMI's rights under insurance policies. Complaint ¶ 36, *WMI Liquidating Trust v. XL Specialty Ins. Co.*, C.A. No. N12C–10–087 (Del.Super. Oct. 8, 2012) [hereinafter Compl.] (Appellant's Appendix at A27); *see* 11 U.S.C. § 541(a).

**2.** One of WMI's subsidiaries, WMI Investment Corp., also filed for bankruptcy, and the two cases were jointly administered.

**3.** WMB was a subsidiary of WMI.

**4.** *See* 11 U.S.C. § 1101, et seq.

**5.** Compl. ¶ 38(A28). WMI and the D & Os provided the Insurers notice of the April 27 letter. XL Specialty responded that that notice was inadequate.

**6.** The Demand Letter also informed the D & Os that other transactions were being investigated that could form the basis of additional claims against the D & Os.

Asserted Claim was that the downstream transaction was without "rational economic justification," and that by authorizing or directing it, the D & Os breached their fiduciary duties and committed waste that caused "needless and considerable harm to WMI."[7] WMI and the Creditors Committee demanded that the D & Os pay the WMI bankruptcy estate $500 million. The Creditors Committee informed the D & Os that, absent a negotiated resolution, they (the Creditors Committee and WMI) would "consider ... other legal options ... to obtain redress for the damages ... suffered."[8]

The record discloses that the D & Os have incurred certain defense costs related to the Asserted Claim. To date, however, the Trust has not initiated any formal legal action against the D & Os to enforce the Asserted Claim.

### (3) Indemnification Rights and Related Insurance Policies

As is commonplace in many corporations, WMI's governing documents obligated WMI to indemnify its D & Os for liability and certain related expenses that the D & Os might incur in performing their duties as WMI officers and directors. WMI's indemnification obligations included a duty to advance and reimburse litigation expenses, even before the final disposition of the proceeding.[9] To provide for its indemnification and advancement obligations, WMI purchased management liability insurance policies ("D & O Insurance") covering WMI and its directors and officers. WMI obtained $250 million in D & O Insurance coverage under twelve separate insurance policies for the period May 1, 2007 to May 1, 2008. Coverage under those 2007–08 policies, although factually germane, is not legally at issue on this appeal.

For the following period—May 1, 2008 to May 1, 2009—WMI obtained $250 million in D & O Insurance coverage constituting a "tower" of twelve insurance policies, consisting of one primary and eleven "excess" policies. Generally, coverage under an excess policy does not become available until the primary policy and all lower-level excess policies have first been exhausted.[10]

The primary 2008–09 policy at the base of the tower is a so-called "ABC" policy, issued by XL Specialty (the "XL Policy"), which provides $25 million of primary coverage. The XL Policy provides coverage of three kinds. "Side A" and "Side B" insurance cover liabilities incurred by Insured Persons (e.g., WMI directors and officers).[11] The identity of the coverage beneficiary, and the issue of whether or not "Side A" or "Side B" is triggered,

7. Demand Letter from counsel for the Creditors' Committee and counsel for WMI to counsel for the D & Os (Oct. 13, 2011) [hereinafter Demand Letter] (A245–47).

8. *Id.* (A249).

9. WMI's Indemnification Agreement prohibited indemnification of "any person from or on account of any acts or omissions of such person finally adjudged to be intentional misconduct or knowing violation of the law by such person, from conduct of the person in violation of Section 8.31 of the [Washington Business Corporation Act] ...." Debtors' Six-

tieth Omnibus Objection to Claims at 10, In re Washington Mut., Inc., No. 08–12229 (Bankr. D.Del.) (A315). WMI's Savings Plan also prohibited indemnification for "gross negligence, willful misconduct, embezzlement or diversion of Plan assets for the benefit of the Employee fiduciary." *Id.*

10. The explanation of the policies is intended as background only, and is not intended as a binding interpretation of the policy terms.

11. The "Side C" coverage—not at issue in this dispute—insures WMI for "Loss" resulting from securities claims.

turns upon whether WMI is legally permitted or required to indemnify any of the Insured Persons for an incurred liability.

The XL "Side A" coverage insures Insured Persons for "Loss" resulting from claims made against them, "except for Loss which the Company [WMI] [12] is permitted or required to pay on behalf of the Insured Persons as indemnification." [13] The XL "Side B" coverage insures WMI for "Loss which [WMI] is required or permitted to pay as indemnification to any of the Insured Persons resulting from a Claim . . . made against the Insured Persons. . . ." [14]

The XL "Side B" coverage is subject to a $50 million retention, meaning that WMI first must incur and be legally responsible for $50 million of indemnification liability before "Side B" coverage is triggered. The $50 million retention requirement does not apply, however, if "indemnification is not made by [WMI] solely by reason of [WMI's] financial insolvency. In the event of financial insolvency, the Retention(s) applicable to ["Side A"] shall apply." [15] But, no retention is "applicable" to the "Side A" coverage. Therefore, no retention requirement applies if either: (i) WMI is not permitted or required to indemnify (i.e., if "Side A" coverage is triggered), or (ii) indemnification is not paid because of WMI's financial insolvency. [16]

The first of the eleven excess policies for the 2008–09 period was issued by National Union Fire Insurance Company of Pittsburgh, Pennsylvania. The National Union policy (also an "ABC" policy) provides excess coverage up to $25 million and follows the terms and conditions of the XL (primary) Policy.

The second 2008–09 excess policy in the tower, issued by Columbia Casualty Company, provides $25 million in "Side A" coverage only. The Columbia policy covers an Insured Person's "Non–Indemnified Loss," which is defined as a "Loss that [WMI] . . . fails or refuses to indemnify or advance to or on behalf of any Insured Person for any reason, including Financial Insolvency." [17] Generally, if coverage is available from the underlying policies, the Columbia and other excess policies are triggered only after those underlying policies have first been exhausted. [18]

The remaining nine excess policies provide "Side A" coverage only, and generally follow the terms of the Columbia policy. The 2008–09 policies also provide that, if payment under those policies is made, the insurer shall be subrogated to the rights of the insured. [19]

---

**12.** The defined term "Company" includes the "Parent Company" (WMI) and certain WMI subsidiaries. For simplicity, we refer to the "Company" as WMI in this Opinion.

**13.** XL Policy, Section I(A)(A48). "Loss" includes "damages, judgments, settlements or other amounts . . . and Defense Expenses in excess of the Retention that the Insured [Insured Persons and/or WMI] is legally obligated to pay." *Id.* Section II(M)(A50).

**14.** *Id.* Section I(B)(A48).

**15.** *Id.* Section IV(D)(A53).

**16.** The Trust argues that the retention does not apply to advancement claims.

**17.** Columbia Casualty Policy, Section III (A105).

**18.** Coverage is also available where the underlying insurers have failed, or are financially unable to provide coverage, or where the underlying insurers are not liable for a Non–Indemnified Loss.

**19.** *See* XL Policy, Section VI(G)(2)(A56) ("In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the Insured."); Columbia Casualty Policy, Section XIV (A112) ("To the extent it pays any Non–Indemnified Loss, the Insurer shall be subrogated to all the Insured Persons' rights

### (4) The Coverage Decision

After the Demand Letter was sent to the D & Os, WMI and several of the D & Os submitted claims to the Insurers for coverage, under the 2008–09 policies, of the Asserted Claim. The primary carrier, XL Specialty, denied coverage on various grounds in letters to the D & Os dated December 22, 2011 and January 25, 2012. XL Specialty indicated, however, that the Asserted Claim would be covered under the 2007–08 policies.[20] Consistent with that indication, defense costs incurred by the D & Os in connection with the Asserted Claim have been paid under those 2007–08 policies.[21]

### (5) The D & O Indemnification Claims and the Bankruptcy Proceedings

On or before March 31, 2009, the D & Os filed proofs of claim in the WMI bankruptcy proceeding, for advancement and indemnification of defense costs and damages relating to, *inter alia*, the Asserted Claim.[22] On November 17, 2010, WMI objected to the D & O claims, asked the Bankruptcy Court to disallow them, and simultaneously moved for a determination of the estimated maximum amount of those claims. Before the Bankruptcy Court ruled on WMI's claim estimation motion, the Trust and the D & Os entered into a stipulation resolving the estimation motion (the "Stipulation"). Under the Stipulation, which the Bankruptcy Court approved in September 2012, the Trust and the D & Os agreed to a $23.4 million reserve, "to be used for distributions upon the granting of any Allowed NonSubordinated D & O Claims."[23] Of that $23.4 million reserve, $18,239,734 was set aside for actual and potential defense expenses associated with the Asserted Claim. Other amounts were set aside for potential subrogation claims of the D & O insurers. The Stipulation provides that if and when any actual or potential defense expenses "are paid by the 2007–2008 Carriers or the 2008–2009 Carriers ... such amount shall be deemed deducted, on a dollar-for-dollar basis, from [that] category and added to the [subrogation claims category.]"[24] The D & Os further agreed that the reserved funds set aside for actual and potential defense expenses would be deemed "released" if a court enters a final order (or

---

of recovery therefor, including without limitation an Insured Persons' right to indemnification or advancement from [WMI], or any Underlying Insurance.").

**20.** It appears that the remaining Insurers have followed XL Specialty's coverage decision.

**21.** The Bankruptcy Court lifted the automatic stay at least three times to enable the 2007–08 insurers to advance or pay to the D & Os defense costs arising out of pending litigation and investigations.

**22.** The D & O claims also included indemnification and advancement claims relating to other claims and legal proceedings.

**23.** Stipulation Resolving, Among Other Things, Estimation Motion With Respect to Certain Disputed Director and Officer Non–Subordinated Indemnification Claims at 12,

*In re Washington Mut., Inc.*, No. 08–12229 (Bankr.D.Del. Sept. 14, 2012) [hereinafter Stipulation] (A267). The reserve was initially established earlier in 2012. On February 21, 2012, the Trust and the D & Os had stipulated to the establishment of a contingent reserve of $65 million "to provide for distributions on account of any Allowed D & O Claims that may be granted relating to any litigation, investigation, or demand, which has been or may be asserted against the D & O Claimants...." *Id.* at 3–4 (A258–59). That stipulation was approved by the Bankruptcy Court on March 1, 2012. In June 2012, after the settlement of certain litigation against the D & Os, the reserve was reduced to approximately $58 million. The $23.4 million represented a further reduction of the reserve.

**24.** Stipulation at 12 (A267).

the parties reach an agreement) providing that:

(1) at least [$19 million of "Side A"] coverage is available for, and the [Insurers] have been ordered to advance, defense fees and expenses for, the D & O Claimants under the 2008–2009 Policies for the Asserted Claim, (2) no retention under the 2008–2009 Policies applies and (3) the [Insurers] have no right of subrogation with respect to the 2008–2009 Policies[.] [25]

While the reserve was being negotiated, the Trust filed, on March 15, 2012, a complaint against the Insurers in the Bankruptcy Court for breach of contract, tortious breach of the duty of good faith and fair dealing, a declaratory judgment that the Insurers are not subrogated to the D & Os' indemnity rights, and for a declaratory judgment that the Insurers' subrogation claims (if any) must be equitably subordinated.[26] In effect, the Trust was seeking a judicially-ordered release of the negotiated reserve. The Bankruptcy Court dismissed the Trust's complaint on the grounds that it had no subject matter jurisdiction to decide the Trust's first two claims,[27] and that its declaratory judgment claims failed to allege a justiciable "actual controversy." [28]

## B. The Superior Court Proceedings and Decision

On October 8, 2012, four days after the Bankruptcy Court dismissed its complaint, the Trust commenced this Superior Court action against the Insurers, contesting their denial of coverage for the Asserted Claim under the 2008–09 policies. The Trust asserted three claims for relief. Count I claims that the Insurers breached their contractual obligations under the 2008–09 policies by denying coverage and failing to pay the D & Os' defense costs associated with (and by not attempting to settle) the Asserted Claim. Count II alleges that, in denying coverage for the Asserted Claim, the Insurers breached their implied duties of good faith and fair dealing under the 2008–09 policies. And, Count III seeks a declaratory judgment that: (i) coverage under the 2008–09 policies is available for the Asserted Claim, (ii) no retention applies to payments for the Asserted Claim under the 2008–09 policies, and (iii) the Insurers are required to pay (for the benefit of the D & Os) any "Loss" under those policies (including defense costs) associated with the Asserted Claim.[29]

The Insurers moved to dismiss the Trust's complaint under Superior Court Civil Rules 12(b)(1) and 12(b)(6). The Insurers argued that the Trust lacks standing to assert its claims, that Counts I and II fail to state claims upon which relief may be granted, and that Count III does not allege an "actual controversy" that is ripe for adjudication. By opinion dated July 30, 2013, the Superior Court denied the Insurers' motion to dismiss. The court determined that the Trust has standing, that the complaint states claims upon which relief can be granted, and that Count III presents a controversy that is

---

**25.** *Id.* at 17–18 (A272–73).

**26.** *In re Washington Mut., Inc.,* 2012 WL 4755209, at *1 (Bankr.D.Del. Oct. 4, 2012).

**27.** *Id.* at *5.

**28.** *Id.* at *6.

**29.** Because the Trust alleges that the D & Os are not entitled to indemnification for any amounts relating to the Asserted Claim, and that the Trust is not permitted under the bankruptcy plan to pay any D & O claims, the Trust's primary goal appears to be to enforce the "Side A" coverage.

ripe for adjudication.[30]

By order dated August 23, 2013, the Superior Court granted the Insurers leave to appeal from its July 30, 2013 interlocutory order.[31] On September 9, 2013, this Court accepted the interlocutory appeal.[32]

### III. THE CONTENTIONS AND THE STANDARD OF REVIEW

The Insurers raise two claims on this appeal. The first is that the Trust lacks standing, because the Trust has suffered no injury that is traceable to the Insurers, and any ruling in the Trust's favor would not redress any asserted injury. The second is that the Trust's declaratory judgment claim does not implicate an "actual controversy" and therefore is not justiciable, i.e., is not a proper subject for adjudication. The Insurers argue that for Delaware courts to entertain a declaratory judgment action, an actual controversy must exist and no actual controversy exists here.

We first address whether the Trust's complaint presents a controversy that is ripe for judicial determination. Because we find that it does not, the Trust's complaint must be dismissed for lack of ripeness. It therefore becomes unnecessary for us to reach the remaining issues presented on this appeal.

 It is well settled that a trial court has discretion in determining whether to entertain a declaratory judgment action.[33] The court may not exercise that discretion, however, unless the action presents an "actual controversy."[34] We review questions of justiciability de novo.[35]

### IV. ANALYSIS

#### A. The Trust's Claims Are Not Ripe

##### (1) The Declaratory Judgment Count

 Delaware courts are statutorily authorized to entertain an action for a

---

30. *WMI Liquidating Trust v. XL Specialty Ins. Co.*, 2013 WL 4046600, at *9 (Del.Super. July 30, 2013).

31. *WMI Liquidating Trust v. XL Specialty Ins. Co.*, C.A. No. N12C–10–087 (Del.Super. Aug. 23, 2013) (ORDER).

32. *XL Specialty Ins. Co. v. WMI Liquidating Trust*, No. 449, 2013 (Del. Sept. 9, 2013) (ORDER).

33. *See Gannett Co., Inc. v. Bd. of Managers of the Delaware Criminal Justice Info. Sys.*, 840 A.2d 1232, 1237 (Del.2003) ("This Court reviews for abuse of discretion the Superior Court's decision to exercise declaratory judgment jurisdiction over a case.").

34. *Id.*

35. *Crescent/Mach I Partners L.P. v. Dr Pepper Bottling Co. of Texas*, 962 A.2d 205, 208 (Del. 2008). Certain Delaware trial court decisions state, however, that a ripeness determination (in the context of declaratory judgment actions) requires an exercise of the court's dis-

cretion. Those cases could possibly be read to suggest that this Court's review of the ripeness issue (a justiciability question) is abuse of discretion. Those cases appear to draw on language from *Stroud v. Milliken Enterprises, Inc.*, where this Court stated:

> The reasons for not rendering a hypothetical opinion must be weighed against the benefits to be derived from the rendering of a declaratory judgment. This weighing process requires "the exercise of judicial discretion which should turn importantly upon a practical evaluation of the circumstances" of the case. In determining whether an action is ripe for judicial determination, a "practical judgment is required."

*Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del.1989) (citation omitted). We do not regard the above-quoted language as prescribing the standard of review of a ripeness determination. In *Stroud*, this Court raised the ripeness issue sua sponte, and therefore did not review the trial court's ripeness determination, nor did this Court address the standard of review.

declaratory judgment,[36] provided that an "actual controversy" exists between the parties.[37] For an "actual controversy" to exist, the following four prerequisites must be satisfied:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[38]

The Superior Court determined that the Trust's claim presents a ripe controversy. In so concluding, the Superior Court apparently credited the Trust's assertions that the Asserted Claim seeks potential damages of $500 million (clearly exceeding the $250 million coverage limit of the 2008–09 policies), and that as a result of the coverage denial, the Trust has been compelled to maintain an $18 million reserve for potential defense costs arising out of the Asserted Claim.[39] We conclude that, in crediting these arguments, the Superior Court erred.

■■ Delaware courts decline to exercise jurisdiction over a case unless the underlying controversy is ripe, *i.e.,* has "matured to a point where judicial action is appropriate."[40] That principle is sometimes expressed in terms of the adage that Delaware courts do not render advisory or hypothetical opinions.[41] The underlying purpose of that principle is to conserve limited judicial resources and to avoid rendering a legally binding decision that could result in premature and possibly unsound lawmaking.[42]

■ A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court "in postponing review until the question arises in some more concrete and final form."[43] Generally, a dispute will be deemed ripe if "litigation sooner or later appears to be unavoidable and where the material facts are static."[44] Conversely, a dispute will be deemed not ripe where the claim is based on "uncertain and contin-

---

36. *See* 10 *Del. C.* § 6501.

37. *Stroud,* 552 A.2d at 479 (Del.1989).

38. *Id.* at 479–80 (quoting *Rollins Int'l, Inc. v. Int'l Hydronics Corp.,* 303 A.2d 660, 662–63 (Del.1973)).

39. *WMI Liquidating Trust v. XL Specialty Ins. Co.,* 2013 WL 4046600, at *8 (Del.Super. July 30, 2013). The Court also accepted the Trust's assertions that the retention does not apply to the D & Os' coverage claims. *Id.*

40. *Stroud,* 552 A.2d at 480 (citing *Schick Inc. v. Amalgamated Clothing & Textile Workers Union,* 533 A.2d 1235, 1239 (Del.Ch.1987)).

41. *Id.* (citing *State v. Mancari,* 223 A.2d 81, 82–83 (Del.1966)).

42. *Id.*

43. *Id.* (quoting *Cont'l Air Lines, Inc. v. C.A.B.,* 522 F.2d 107, 124–25 (D.C.Cir.1974)); *see also Schick Inc.,* 533 A.2d at 1239 ("[I]n deciding whether a particular declaratory judgment action is ripe for judicial determination, a practical evaluation of the legitimate interest of the plaintiff in a prompt resolution of the question presented and the hardship that further delay may threaten is a major concern. Other necessary considerations include the prospect of future factual development that might affect the determination to be made; the need to conserve scarce resources; and a due respect for identifiable policies of the law touching upon the subject matter of the dispute.").

44. *Julian v. Julian,* 2009 WL 2937121, at *3 (Del.Ch. Sept. 9, 2009) (quoting *Stroud,* 552 A.2d at 481) (internal quotation marks omitted).

gent events" that may not occur,[45] or where "future events may obviate the need" for judicial intervention.[46] In this specific insurance coverage context, the plaintiff must establish a "reasonable likelihood" that coverage under the disputed policies will be triggered.[47] Relatedly, our courts will decline "to enter a declaratory judgment with respect to indemnity until there is a judgment against the party seeking it." [48]

Here, the Trust seeks a judicial determination that, if made, would necessarily be premised on uncertain and hypothetical facts and that ultimately may never become necessary. The declaratory judgment count of the Trust's complaint would require the Superior Court first to determine whether the Insurers correctly interpreted and applied the 2008–09 policies' coverage exceptions when denying coverage for the Asserted Claim.[49] That court would also have to determine whether the $50 million retention requirement applies to any claims associated with the Asserted Claim, including whether no retention requirement exists because the retention does not apply to advancement claims, or because the WMI bankruptcy proceedings operated to reduce the retention to $0,[50] or because the Trust is not legally permitted or required to indemnify the D & Os. The court might also have to determine whether the "Side A" excess policies might be triggered even if the retention requirement were not satisfied and the underlying "ABC" policies were not exhausted. The pled facts impel us to conclude that none of these judicial determinations are necessary at this time.

There are four interrelated coverage claims that might arguably implicate the 2008–09 policies: (i) claims for advancement of defense costs, (ii) claims for payment of a settlement or judgment, (iii) claims made by the D & Os, and (iv) claims made by the Trust. The Trust has not alleged, however, that it has made any claims for coverage. Nor could it: the Trust disclaims any obligation to indemnify the D & Os, and therefore would never have coverage claims to assert in its own right. And although the Trust argues that the Asserted Claim for $500 million in damages implicates the $250 million coverage limits of the 2008–09 policies, no settlement or judgment-related coverage claims have been (or could be) made at this point. The reason is that no litigation that might lead to a judgment—or a settlement—of the Asserted Claim has been commenced. The only presently existing claims that might arguably implicate the 2008–09 policies are the D & Os' claims for defense costs. But, it is undisputed that those defense costs are being covered under the 2007–08 policies, and the Trust has not alleged that any amounts that could impli-

---

**45.** *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del.Ch.2006).

**46.** *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 631–32 (Del.Ch.2005), *aff'd in relevant part, rev'd in part*, 901 A.2d 106 (Del. 2006).

**47.** *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 623 A.2d 1133, 1137 (Del.Super.1992).

**48.** *Wal–Mart Stores, Inc.*, 872 A.2d at 632 (quoting *Dana Corp. v. LTV Corp.*, 668 A.2d

752, 756 (Del.Ch.1995), *aff'd,* 670 A.2d 1337 (Del.1995)).

**49.** "The first step in this process of common sense evaluation is the identification of the legal questions in the case." *Stroud,* 552 A.2d at 480.

**50.** Or, by way of another question that may or may never need to be addressed, whether the retention was only reduced to the amount ordered available by the Bankruptcy Court for coverage of the D & Os' defense expenses, *i.e.,* $18 million.

cate coverage under the 2008–09 policies have not been paid under the 2007–08 policies. Nor do the pled facts establish a reasonable likelihood that any such future amounts will go unpaid.

To illustrate why, we discuss four hypothetical scenarios where future events relating to the Asserted Claim might unfold and implicate the 2008–09 policies. Those hypotheticals underscore that any judicial determination at this stage would necessarily amount to an impermissible advisory opinion.[51]

First, the Trust might decide not to initiate legal action against the D & Os with respect to the Asserted Claim. Second, if the Trust decided to bring such an action, the D & Os might ultimately prevail. Third, the D & Os might reach a settlement with the Trust. And fourth, the Trust might obtain a judgment against the D & Os. In the first two hypothetical scenarios, the 2008–09 policies may never be implicated, because the 2007–08 policies might cover any incurred D & O defense costs. Although the Trust alleges that the 2007–08 policies are "nearly exhausted,"[52] the complaint omits to specify what amount of coverage remains. Even if (hypothetically) the 2007–08 policies were 90% exhausted, $25 million would still remain available to pay the D & Os' defense costs. Indeed, the Stipulation estimates that only $18 million would be required for defense costs associated with the Asserted Claim. If the 2008–09 policies are never implicated, any determination at this stage about

coverage under 2008–09 policies would be based on pure speculation about future events.

The third and fourth hypothetical scenarios might implicate the 2008–09 policies, but that would depend on whether (or to what extent) full coverage for any resulting claims would be available under the 2007–08 policies. Should either scenario materialize and implicate the 2008–09 policies, any settlement or judgment might—or might not—obligate the Trust to indemnify the D & Os. If the Trust is not permitted to indemnify the D & Os for any settlement or judgment (in which case "Side A" coverage with no retention would apply), any determination about the retention based on WMI's insolvency or bankruptcy proceedings would have been academic. Similarly, any determination made about the retention based on whether indemnification by the Trust is permitted (and whether "Side A" or "Side B" coverage applies) would rest on the court's predicted outcome of any litigation or settlement of the Asserted Claim—predictions that could ultimately turn out to be inaccurate.[53] Without an actual settlement or judgment in place, the retention issue presents too many "what-ifs" for any court to proceed.

What the foregoing hypotheticals do show is that the dispute between the Trust and the Insurers has not yet assumed a "concrete and final form." The pled facts do not demonstrate a "reasonable likelihood" that the 2008–09 policies will be

---

**51.** *See Stroud,* 552 A.2d at 480 ("Courts decline to render hypothetical opinions ... dependent on supposition...."); *Monsanto Co. v. Aetna Cas. & Sur. Co.,* 565 A.2d 268, 275 (Del.Super.1989) ("[T]he Court must be sure that it does not construct hypothetical factual situations on which it makes a finding, putting forth an advisory opinion. The matter would clearly not be ripe for adjudication in that situation.").

**52.** Compl. ¶ 6(A15).

**53.** *See Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d 611, 632 (Del.Ch.2005), *aff'd in relevant part, rev'd in part,* 901 A.2d 106 (Del. 2006) ("Courts have declined to enter a declaratory judgment with respect to indemnity until there is a judgment against the party seeking it.").

triggered. Nor has the Trust alleged a present (or likely) harm that establishes a cognizable interest in an immediate resolution of the coverage dispute. The most obvious harm that could necessitate judicial intervention at this stage—that coverage claims have gone (or will likely go) unpaid—has yet to become a "real world" problem. To reiterate, the Trust does not claim that any of the D & Os' defense expenses have not been paid under the 2007–08 policies, or that any such amounts will likely go unpaid and implicate the 2008–09 policies.

The Trust argues that it has been harmed because the Insurers' blanket denial of coverage under the 2008–09 policies necessitated the establishment of the $18 million reserve, which in turn prevented the Trust from satisfying the claims of other WMI creditors. But, that claimed harm to the Trust is illusory.[54]

First, the Insurers were not parties to the Stipulation. The Trust's potential indemnification obligations to the D & Os (which form the basis for the D & Os' bankruptcy proofs of claim and the $18 million reserve) exist solely by reason of WMI's governing documents and WMI's contractual agreements with the D & Os. Those potential obligations exist whether or not coverage is available to the D & Os under the 2008–09 policies. Indeed, the Stipulation provides that any amounts paid by the Insurers to the D & Os for defense costs related to the Asserted Claim will not be released from the reserve. Instead, those amounts must be set aside to cover subrogation claims against the Trust that the Insurers may have.

Second, even if the Superior Court ruled that coverage exists under the 2008–09

policies and that no retention applies to any potential D & O coverage claims, as a practical matter that would not operate to release the reserved funds. The D & Os have agreed that the $18 million reserve will be released only upon the entry of a judgment (or an agreement with the Insurers) that (*inter alia*) the Insurers have no subrogation rights under the 2008–09 policies. Yet, the Trust has never sought any determination of subrogation rights in this proceeding.

The Trust's only interest in having its dispute litigated now is apparently to receive judicial guidance about how much coverage *would* be available to the D & Os *if* the Trust were to initiate litigation against them. The Trust seeks that guidance, not as a contractual counterparty seeking to vindicate the D & Os' contractual rights, but rather as a potential claimant against the D & Os. The Trust's desire to receive advice is not a cognizable interest that will justify a Delaware court exercising its jurisdiction to decide this dispute. As noted, our courts do not issue advisory opinions.

### (2) The Remaining Counts

Because the Trust's declaratory judgment count is not ripe for adjudication, it follows that the Trust's claims for breach of contract are also unripe. Counts I and II of the complaint arise out of the same controversy that is the subject of the declaratory judgment count (Count III)—the Insurers' denial of coverage under the 2008–09 policies. It would be logically inconsistent for this Court to rule that a dispute is not sufficiently ripe to warrant entertaining a declaratory judgment claim, yet is sufficiently ripe to justify entertain-

---

**54.** Although it is not the basis for our conclusion, we note that WMI's bankruptcy plan called for the distribution of approximately $7 billion to creditors and shareholders, result-

ing in full satisfaction of most unsecured creditor claims. *In re Washington Mut., Inc.,* 2012 WL 4755209, at *3 (Bankr.D.Del. Oct. 4, 2012).

ing and deciding claims for contractual breach.[55] Even if the Trust's claims for breach of contract and for breach of the implied duty of good faith and fair dealing were found to state claims for relief,[56] the underlying controversy still remains unripe for adjudication. It is undisputed that the 2007–08 policies have paid the D & Os' defense costs, and any unpaid defense cost claims may never materialize. Even if they were to materialize, the Superior Court could not determine, at this stage, the amount and nature of those future claims. That is, the Superior Court would be unable to determine, with any certainty, the nature and extent of any contractual breaches, or the amount of any resulting damages. A present resolution of the Trust's claims could only be based on judicial speculation and ultimately might prove to have been unnecessary.

### (3) The Remaining Arguments

Lastly, the Trust argues that two Delaware cases—*Hoechst Celanese Corp. v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania,*[57] and *North American Philips Corp. v. Aetna Casualty & Surety Co.*[58]—require us to conclude that the dispute between the Trust and the Insurers is ripe for adjudication. Those cases are factually distinguishable. *Hoechst* involved a dispute between a manufacturer and its general liability insurers. Certain insurers sought the dismissal of the claims against the excess insurers that

provided coverage above the $20 million level.[59] The court noted that the manufacturer's product-related judgment and settlement liabilities had amounted to several million dollars as of October 1989 (the case was decided in 1992), and that liabilities had increased by 400% by November 1990, and again by 400% by March 1992. All those amounts easily exceeded the $20 million threshold. The court reasoned that if (as the manufacturer alleged) the manufacturer's claims were to fall under one policy period, under at least some policies coverage above $20 million would be triggered.[60] Therefore, the court determined, the dispute between the manufacturer and its liability insurers was ripe for adjudication.

*Philips* involved a dispute between North American Philips Corporation ("Philips") and its liability insurers over coverage of Philips' environmental liabilities.[61] Certain excess insurers sought dismissal of the claims against them. The court determined that because Philips had already incurred liabilities of $49 million and had projected future additional liabilities of at least $36 million, Philips had established a likelihood that at least some of the excess policies would be implicated.[62] On that basis, the court determined that the dispute was ripe for adjudication.

Both the *Hoechst* and the *Philips* courts concluded that it would be difficult to distinguish between those excess policies that would be triggered and those that would

---

55. *See Stroud,* 552 A.2d at 479 (explaining that the declaratory judgment statute may serve to *"advance* the stage at which a matter is traditionally justiciable") (emphasis added).

56. The Insurers do not challenge the Superior Court's determination that Counts I and II state claims upon which relief may be granted.

57. 623 A.2d 1133 (Del.Super.1992).

58. 565 A.2d 956 (Del.Super.1989).

59. *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 623 A.2d 1133, 1135–36 (Del.Super.1992).

60. *Id.* at 1139–40.

61. *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.,* 565 A.2d 956, 957 (Del.Super.1989).

62. *Id.* at 962.

not. In those cases, therefore, the most efficient use of judicial resources was to resolve all claims as to all excess insurers simultaneously.[63] Here, unlike in *Hoechst* and *Philips*, the issue is whether *any* of the 2008–09 policies will be triggered.[64] The Trust has not alleged facts from which one could reasonably infer that any of those policies likely will be.[65] Further complicating the coverage questions is the applicability of the retention, about which any determination would necessarily be speculative.

## V. CONCLUSION

For the foregoing reasons, the Superior Court judgment is REVERSED. We REMAND the case to the Superior Court with instructions to dismiss the complaint without prejudice. Jurisdiction is not retained.

---

**63.** *See Hoechst*, 623 A.2d at 1140 ("The Court is unable to draw a line above which it can be said with any precision or certainty that coverage is unlikely to be implicated. Such demarcation being impracticable, the principles of judicial economy and comprehensive, final resolution require that all of the excess insurers potentially implicated remain in this action."); *Philips*, 565 A.2d at 962 ("[P]laintiff has made a sufficient showing that due to its current and future liability and considering the magnitude of this case it is likely that the excess carriers coverage will be triggered.... [T]he best interests of justice are served if plaintiff's claims surrounding its current liability and future liabilities are all resolved uniformly by this Court.").

**64.** And, unlike in *Hoechst* and *Philips* where existing third party claims against the plaintiffs provided a historical basis for estimating potential liability, here the dispute surrounds a single source of liability (*i.e.*, the Asserted Claim), making it difficult to estimate the D & Os' potential liability.

**65.** The Trust also argues that a final judgment or settlement is not a prerequisite for finding that this insurance coverage dispute is ripe. That argument is inapposite. Our holding is based not on the absence of a judgment or settlement *per se*, but on the Trust's failure to establish a reasonable likelihood that the 2008–09 policies will be triggered. We thus conclude that any judicial determination at this stage would be based on uncertain, hypothetical facts.