**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

SHAREHOLDER REPRESENTATIVE )
SERVICES LLC, solely in its capacity as )
representative of the Securityholders, )
                                      )
             Plaintiff/Counterclaim-Defendant, )
                                      )
       v. )           C.A. No. 2020-1069-MTZ
                                      )
ALEXION PHARMACEUTICALS, INC., )
                                      )
           Defendant/Counterclaim-Plaintiff. )

## <u>ORDER DENYING DEFENDANT'S MOTION TO DISMISS</u>

WHEREAS, on review of Defendant's motion to dismiss (the "Motion"), as briefed and taken under advisement on June 2, 2021, it appears:[1]

A.      Defendant Alexion Pharmaceuticals, Inc. ("Alexion") is an international pharmaceutical company focused on developing and commercializing drugs to treat rare diseases. On November 2, 2018, Alexion closed its acquisition of Syntimmune, Inc., a biopharmaceutical development company in the same space (the "Merger"). Before the Merger, Syntimmune had patented and was developing a pharmaceutical candidate, known as "SYNT001," to treat rare autoimmune diseases.[2] In the period leading up to the Merger, Syntimmune completed several

---

[1] For the purposes of the pending Motion, I draw the relevant facts from the Verified Complaint. *See* Docket Item ("D.I.") 1 [hereinafter "Compl."].

[2] Alexion subsequently renamed SYNT001 "ALXN1830." For clarity's sake, I refer to SYNT001 by its original name, which the plaintiff used in its complaint.

long-term animal toxicology and pharmacology studies on SYNT001, which showed promise for eventual human testing and regulatory approval.

B.    The parties memorialized the Merger in the "Merger Agreement" between Alexion, Syntimmune, and Plaintiff Shareholder Representative Services, LLC ("SRS"), which represented Syntimmune's pre-Merger stockholders and option holders (the "Securityholders").[3]   Through the Merger, Alexion acquired SYNT001, as well as any finished and in-process drug product derived from it.

C.    In return, Syntimmune's Securityholders received $400 million in cash, with the possibility of an additional $800 million in earn-out payments based on SYNT001's development (the "Earn-Out Payments").   These payments are triggered by eight "Milestone Events," described in Section 3.8(a) of the Merger Agreement:

(i)    a one-time payment of One Hundred Thirty Million Dollars ($130,000,000) upon the earlier of (A) the successful completion of a Phase I Clinical Trial of the SC Formulation as demonstrated by achievement of the criteria set forth on Exhibit I or (B) submission to the FDA of a protocol for a Pivotal Clinical Trial for any subcutaneous formulation;

(ii)    a one-time payment of One Hundred Twenty Million Dollars ($120,000,000) upon the first dosing of the first patient in a Pivotal Clinical Trial for any first Indication;

(iii)    a one-time payment of One Hundred Twenty Million Dollars ($120,000,000) upon the first dosing of the first patient in a Pivotal Clinical Trial for a second Indication.

_____

[3] Compl. Ex. 1 [hereinafter "Merger Agr."].

(iv)   a one-time payment of One Hundred Fifty Million Dollars ($150,000,000) upon receipt of Regulatory Approval from the FDA for any first Indication;

(v)   a one-time payment of One Hundred Fifty Million Dollars ($150,000,000) upon receipt of Regulatory Approval from the FDA for a second Indication;

(vi)   a one-time payment of Twenty-Five Million Dollars ($25,000,000) upon receipt of Regulatory Approval from the EMA for any first Indication;

(vii)   a one-time payment of Twenty-Five Million Dollars ($25,000,000) upon receipt of Regulatory Approval from the EMA for a second Indication; and

(viii)   a one-time payment of Eighty Million Dollars ($80,000,000) (the "*Sales Earn-Out Payment*") upon the determination at the end of Buyer's fiscal year that the Net Sales for such fiscal year across all Indications equals or exceeds One Billion Dollars ($1,000,000,000) (the "*Sales Earn-Out Goal*").[4]

Alexion must pay these amounts no matter when it achieves the Milestone Events.[5]

---

[4] *Id.* §§ 3.8(a)(i)–(viii).  If Alexion achieves the Milestone Events out of order, Section 3.8(d) provides that earlier milestone payments would automatically become due once later milestones were reached:

> If any given Earn-Out Payment is due and one or more previous Earn-Out Payments would reasonably have been anticipated to precede such Earn-Out Payment for the achievement of Milestone Events have not been paid for any reason, then payment of all such preceding unpaid Earn-Out Payments will be due at such time as well.  For example, if Earn-Out Payment (ii) were to become due, and Milestone Event (i) has not yet been achieved and accordingly Earn-Out Payment (i) had not been paid, then Earn-Out Payment (i) will become due at the time Earn-Out Payment (ii) becomes due.

*Id.* § 3.8(d).

[5] *Id.* §§ 3.8(k)–(l).

D.     In addition to committing to paying SRS for certain results, Alexion also committed to a standard of diligence in pursuit of those results for the first seven years after closing.  Section 3.8(f) provides:

> For a period of seven (7) years following the Closing Date, [Alexion] shall and shall cause its Affiliates (including the Company) to use Commercially Reasonable Efforts to achieve (or cause its Affiliates, licensees or sublicensees with respect to rights to develop or commercialize the Product to achieve) each of the Milestone Events . . .[6]

The Merger Agreement defines "Commercially Reasonable Efforts:"

> "*Commercially Reasonable Efforts*" means, with respect to the Product, using such efforts and resources typically used by biopharmaceutical companies similar in size and scope to [Alexion] for the development and commercialization of similar products at similar development stages taking into account, as applicable, the Product's advantages and disadvantages, efficacy, safety, regulatory authority-approved labeling and pricing, the competitiveness in the marketplace, the status as an orphan product, the patent coverage and proprietary position of the Product, the likelihood of development success or Regulatory Approval, the regulatory structure involved, the anticipated profitability of the Product, and other relevant scientific, technical and commercial factors typically considered by biopharmaceutical companies similar in size and scope to [Alexion] in connection with such similar products.  The obligation to use such efforts and resources, however, does not require that [Alexion] or its Affiliates act in a manner which would otherwise be contrary to prudent business judgment and, furthermore, the fact that the objective is not actually accomplished is not dispositive evidence that [Alexion] or any of its Affiliates did not in fact utilize its Commercially Reasonable Efforts in attempting to accomplish the objective.[7]

---

[6] *Id.* § 3.8(f).

[7] *Id.* § 1.1 (defining "Commercially Reasonable Efforts").  It appears the "Product" is SYNT001.  *See id.* (defining "Product"); *see also id.* Ex. H.

4

E.      Section 3.8(h) requires Alexion to provide SRS with written annual reports detailing SYNT001's development and Alexion's efforts to achieve the Milestone Events (each an "Annual Report").[8]  Section 8.1 of the Merger Agreement also provides that the Securityholders would indemnify Alexion for losses caused by various breaches of various obligations, including Syntimmune's representations and warranties.[9]  Ten percent of the upfront purchase price ($40 million) was placed in escrow to cover potential indemnification claims, to be released to the Securityholders eighteen months after closing.[10]

F.      After the Merger, Alexion initially reported successful and promising advances in SYNT001's development as of March 2019.  The 2019 Annual Report indicated that further studies, which would allegedly achieve multiple Milestone Events, were set "to begin in either 4Q2019 or 1H2020."[11]  Despite this apparent progress, SRS alleges that this report was extremely vague and did not reveal the details of Alexion's development plans.  After the 2019 Annual Report, in the fall and winter of 2019, Alexion filed several public disclosures with the SEC.  While

---

[8] *See id.* § 3.8(h).

[9] *See id.* §§ 8.1(a)–(h); *see also id.* §§ 8.3(a)–(d) (describing the indemnification procedures).

[10] *Id.* § 3.7; *see also id.* § 1.1 (defining "Escrow Amount").

[11] Compl. ¶ 88; *see also id.* ¶¶ 90, 101.

early disclosures mirrored the 2019 Annual Report, later disclosures appeared to walk back this progress.

G. In November 2019, Alexion sent SRS a letter demanding indemnification under the Merger Agreement based on allegedly defective batches of drug product it received from Syntimmune (the "Indemnification Claim"). Alexion claimed these defects compelled it to "place three ongoing clinical trials on hold prior to completion."[12] SRS has refused to pay the Indemnification Claim, arguing that it is frivolous and that Alexion asserted it to distract from and explain away its own failures in developing SYNT001.

H. In January 2020, Alexion filed public disclosures showing that SYNT001's development had fallen "significantly behind schedule."[13] In its 2020 Annual Report, filed in March 2020, Alexion disclosed that it "was forced to terminate prior to completion" clinical trials on SYNT001, and had done so in "2Q2019" despite promising results.[14]

I. Based in part on Alexion's public disclosures, SRS alleges Alexion failed to use the required Commercially Reasonable Efforts under Section 3.8(a). According to SRS, Alexion ceased to use Commercially Reasonable Efforts "no later

---

[12] *Id.* ¶ 107.

[13] *Id.* ¶ 120.

[14] *Id.* ¶ 122.

than October 4, 2019."[15] SRS points to several failures, including several discontinued or abandoned SYNT001 clinical studies and Alexion's failure to timely replace the defective drug product it inherited from Syntimmune. SRS claims these actions were commercially unreasonable both when compared to "biopharmaceutical companies similar in size and scope" to Alexion, and when considering the specific circumstances of the time, including the COVID-19 pandemic.[16]

J.     On December 12, AstraZeneca plc announced it was acquiring Alexion for $39 billion. The parties have not addressed how, if at all, this transaction impacts Alexion's obligations under the Merger Agreement.

K.     SRS filed its complaint in this action on December 17 (the "Complaint").[17] The Complaint asserts two counts. Count I alleges Alexion breached the Merger Agreement by failing to use Commercially Reasonable Efforts in developing SYNT001 under Section 3.8(a). To remedy this breach, SRS seeks, among other things, money damages up to "the sum total of all unpaid Earn-Out Payments."[18] Count II seeks a declaratory judgment that Alexion's Indemnification Claim is without merit.

---

[15] *Id.* ¶ 213.

[16] *Id.* ¶ 214.

[17] *See generally* Compl.

[18] *Id.* ¶ 215.

7

L.     Alexion filed its Motion on February 12.[19]  The Motion argues that SRS's breach of contract claim in Count I is not ripe, and thus, should be dismissed under Rule 12(b)(1).[20]  On February 16, Alexion filed its answer and asserted its Indemnification Claim as a breach of contract counterclaim (the "Answer").[21]  The parties fully briefed the Motion and the Court heard oral argument on June 2, 2021.[22]

M.     The Motion does not dispute that SRS has stated a claim for breach of contract under Court of Chancery Rule 12(b)(6).[23]  Instead, Alexion argues SRS's claim, that Alexion failed to use Commercially Reasonable Efforts for only part of a still-ongoing seven-year period, is not yet ripe.  Thus, the question is not whether Alexion used Commercially Reasonable Efforts.  This order assumes it did not.  Rather, the question is when, if at all, that breach ripened.

N.     For its part, SRS argues Alexion's breach ripened when the breach occurred, and that the facts underlying its breach of contract claim are sufficiently static to adjudicate them now.

O.     Alexion's ripeness argument presents an issue of justiciability.  "Ripeness, the simple question of whether a suit has been brought at the correct time,

---

[19] D.I. 24.

[20] *See* D.I. 24; D.I. 27 at 13; D.I. 40 at 1.

[21] D.I. 26.

[22] D.I. 49; D.I. 50 [hereinafter "Hr'g Tr."].

[23] *See* D.I. 40 at 3–6.  *See generally* D.I. 24; D.I. 27.

8

goes to the very heart of whether a court has subject matter jurisdiction."[24]  "Because the requirement of an actual controversy goes directly to the court's subject matter jurisdiction over an action, a motion to dismiss based on justiciability grounds is properly examined under Rule 12(b)(1)."[25]  Plaintiff bears the burden of pleading sufficient facts to establish the Court's subject matter jurisdiction.[26]  When assessing whether it has carried that burden, "the Court should accept the material factual allegations in the complaint as true, and all inferences therefrom should be construed in the non-moving party's favor."[27]

---

[24] *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006).

[25] *Nama Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 435 n.43 (Del. Ch. 2007).

[26] *Hall v. Coupe*, 2016 WL 3094406, at *2 (Del. Ch. May 25, 2016).

[27] *de Alder v. Upper N.Y. Inv. Co. LLC*, 2013 WL 5874645, at *7 (Del. Ch. Oct. 31, 2013) (footnotes and internal quotation marks omitted) (citing *Diebold Comput. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586, 588 (Del. 1970), and then citing *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 489 (Del. 1982)); *see, e.g.*, *Janowski v. Div. of State Police*, 981 A.2d 1166, 1169 (Del. 2009) ("We determine subject matter jurisdiction from the face of the complaint at the time of filing and assume that all material factual allegations are true. As the plaintiff, Janowski must establish that Delaware courts have jurisdiction over his claim." (footnotes omitted) (citing *Diebold*, 267 A.2d at 590); *Stidham v. Brooks*, 5 A.2d 522, 524 (Del. 1939)); *Wilm. Fraternal Order of Police Lodge #1 v. Bostrom*, 1999 WL 39546, at *4 (Del. Ch. Jan. 22, 1999) ("Subject matter jurisdiction is determined from the face of the complaint as of the time it was filed, with all material factual allegations assumed to be true." (citing *Diebold*, 267 A.2d at 590, and then citing *W. Airlines, Inc. v. Allegheny Airlines, Inc.*, 313 A.2d 145, 149 (Del. Ch. 1973))).  *But see Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) ("Unlike the standards employed in Rule 12(b)(6) analysis, the guidelines for the Court's review of a 12(b)(1) motion are far more demanding on the non-movant.  The burden is on the Plaintiffs to prove jurisdiction exists.  Further, the Court need not accept Plaintiff's factual allegations as true and is free to consider facts not alleged in the complaint." (alteration omitted) (quoting *Phillips v. County of Bucks*, 1999 WL 600541, at *1 (E.D.Pa. Aug. 9, 1999)).

9

P. To evaluate ripeness, the Court makes a "common sense assessment":

> A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form. Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static. Conversely, a dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention.[28]

The ripeness doctrine conserves scarce judicial resources and "prevents Delaware courts from exercising jurisdiction over disputes where doing so would result in the rendering of an advisory or hypothetical opinion."[29]

Q. Ripeness also implicates the closely related question of when a claim accrues. In contrast to other states, Delaware applies an "occurrence rule" to determine when a cause of action accrues.[30] Generally, "a cause of action accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[31] "[F]or contract claims, the wrongful act occurs at the time a contract is

---

[28] *XI Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1217–18 (Del. 2014) (footnotes and internal quotation marks omitted) (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989), then quoting *Julian v. Julian*, 2009 WL 2937121, at *3 (Del. Ch. Sept. 9, 2009), then quoting *Bebchuk*, 902 A.2d at 740, and then quoting *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 631–32 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006)).

[29] *Solak v. Sarowitz*, 153 A.3d 729, 736 (Del. Ch. 2016).

[30] *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020).

[31] *Id.*

breached."[32]  Thus, a breach of contract claim accrues "at the time the contract is broken, not at the time when actual damage results or is ascertained."[33]  Absent tolling, the accrual of a cause of action starts the clock on the statute of limitations.[34]  To give a plaintiff the full benefit of the statute of limitations period, a consistent understanding of claim "accrual" must be applied in the ripeness context.[35]

**IT IS HEREBY ORDERED**, this 1st day of September, 2021, that:

1.     The Complaint states a ripe claim for breach.  SRS alleges Alexion ceased using Commercially Reasonable Efforts, in breach of the Merger Agreement, by October 4, 2019.  Because a breach of contract claim "accrues at the time of breach," SRS's claim accrued no later than that date.[36]  At that point, it also ripened. The facts supporting SRS's claim are static because the claim depends only on

---

[32] *Id.*

[33] *Smith v. Mattia*, 2010 WL 412030, at *3 (Del. Ch. Feb. 1, 2010) (quoting *Worrel v. Farmers Bank of Del.*, 430 A.2d 469, 472 (Del. 1981)).

[34] *ISN Software*, 226 A.3d at 733.

[35] Several Delaware cases discuss claim accrual and ripeness concurrently.  In the context of common law indemnification claims, for example, this Court has held that a claim for indemnification that has not yet accrued is not ripe.  *See Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *15 (Del. Ch. Jan. 24, 2005) (dismissing an unaccrued indemnification claim on ripeness grounds); *Breakaway Sols., Inc. v. Morgan Stanley & Co. Inc.*, 2004 WL 1949300, at *15 (Del. Ch. Aug. 27, 2004) (same); *Himbrick v. Dover Hosp. Grp., LLC*, 2012 WL 2044343, at *2 (Del. Super. May 1, 2012) (same); *see also LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 197–98 (Del. 2009); *Winshall v. Viacom Int'l, Inc.*, 2016 WL 3462119, at *8 (Del. Super.Feb. 29, 2016); *Quereguan v. New Castle County*, 2006 WL 2522214, at *5 (Del. Ch. Aug. 18, 2006).

[36] *See ISN Software*, 226 A.3d at 732.

Alexion's *past* conduct. Whether those efforts fell short of the Commercially Reasonable Efforts required by Section 3.8(f) "can be determined on a record developed from currently available evidence."[37] Having "matured to the point where the plaintiff has suffered . . . an injury," the dispute over whether Alexion's past efforts were commercially reasonable is ripe.[38]

2. Alexion argues that because the Commercially Reasonable Efforts period lasts seven years, it still has nearly five years to achieve the Milestone Events without breaching the Merger Agreement. In effect, Alexion argues that it can catch up and achieve the Milestone Events despite any lapse in its efforts. Alexion's argument conflates its obligations to pay upon certain results, at any time, with its obligations to pursue those results with a certain amount of diligence for a period of time. Section 3.8(f) requires conduct (*i.e.*, Commercially Reasonable Efforts), not results (*i.e.*, the Milestone Events).[39] Alexion's efforts obligation requires persistent

---

[37] *Williams v. Ji*, 2017 WL 2799156, at *4 (Del. Ch. June 28, 2017).

[38] *See Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 816 (Del. 2018).

[39] Merger Agr. § 3.8(f) ("[Alexion] shall . . . use Commercially Reasonable Efforts to achieve . . . each of the Milestone Events"); *see Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *86 (Del. Ch. Oct. 1, 2018) (explaining efforts clauses "define the level of effort that the party must deploy to attempt to achieve the outcome" in order to "mitigate the rule of strict liability for contractual non-performance that otherwise governs"); *see also* Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions*, § 13.06, at 13-44 (2021 ed.) ("In acquisition transactions, the parties will generally bind themselves to achieve specified results with respect to activities that are within their control . . . and reserve [an efforts] standard for things outside of their control or those dependent upon the actions of third parties.").

12

efforts for the entire contractual seven-year period, as distinct from long-term results.[40] When Alexion failed to put forward those efforts, it breached Section 3.8(f).[41] The facts surrounding Alexion's substandard past efforts are static, and that breach can be adjudicated now.

3. Alexion also argues that SRS's damages model, seeking all $800 million in milestone payments, is speculative. But that argument "is properly directed to the merits of [SRS's] claims, not to ripeness."[42] To be sure, whether and when Alexion achieves the Milestone Events will bear on the measure of damages available to SRS. Valuing the failure or delay in achieving these Milestone Events will be difficult, especially given that Alexion's obligation to make the Earn-Out

---

[40] *See Akorn*, 2018 WL 4719347, at *86. A natural question follows: for how long during a multi-year Commercially Reasonable Efforts obligation must the obligor behave unreasonably in order to breach that obligation? Is one month of lackadaisical work from the lab staff sufficient? One week? One day? Answering this question will likely depend in part on implementing unclear contract language. *See Akorn*, 2018 WL 4719347 at *87 (surveying sources of meaning for "commercially reasonable efforts"); *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *7 (Del. Ch. Dec. 28, 2018) (same); *see also id.* at *1, *7–8 (bemoaning a similar definition for "commercially reasonable efforts" in a pharmaceutical earnout as "inartful" and noting the "novel" obligation was not clear and unambiguous at the pleading stage). I do not grapple with this question here because Alexion does not dispute that the Complaint states a claim for breach of contract under Rule 12(b)(6).

[41] *See* Kling & Nugent, *supra* note 40, § 17.03, at 17-32 n.12.1 (describing affirmative covenants requiring the buyer to take action to improve the business's post-closing business, under which buyer inaction gives rise to breach); *compare* Merger Agr. § 3.8(f), *with Quarum v. Mitchell Int'l, Inc.*, 2020 WL 351291, at *4–5 (Del. Super. Jan. 21, 2020) (explaining an earnout requiring use of commercially reasonable efforts "to avoid taking actions" that would reduce the earnout amount was a negative covenant).

[42] *Williams*, 2017 WL 2799156, at *4.

13

Payments abides in perpetuity.[43] While Alexion's concerns bear on SRS's ability to prove its current damage model, "[t]his case is not unripe merely because there exist valuation questions" regarding delays in receiving the Earn-Out Payments.[44] As the master of its complaint, SRS is entitled to proceed down that necessarily uncertain path. For today, it is enough to say that SRS's claim has accrued.

4. Practical concerns also support this result. Part of Alexion's alleged breach was its failure to timely replace the allegedly defective drug product it inherited in the Merger.[45] Alexion's Indemnification Claim, the subject of Count II of the Complaint and Alexion's single counterclaim, focuses on these defects as well.[46] Adjudicating claims with these overlapping factual issues at one time makes practical sense and furthers the ideals of judicial economy the ripeness doctrine advances.[47] It is also sensible to determine whether Alexion breached the Merger Agreement before faded memories, lost evidence, or other practical hurdles frustrate

---

[43] *See* Merger Agr. § 3.8(k)–(l); *see also* D.I. 27 at 16 n.6.

[44] *See Williams*, 2017 WL 2799156, at *4.

[45] *See* Compl. ¶ 214.

[46] Alexion's counsel acknowledged this point at the hearing on the Motion. Hr'g Tr. 69:9–14 ("Now, of course it's true that if Alexion inherited contaminated drug product, which is linked to SRS violating its reps and warranties, of course it is true that that could be relevant and bear on the acts and decisions that Alexion made in furtherance of its [Commercially Reasonable Efforts].").

[47] *E.g.*, *Solak*, 153 A.3d at 736.

that effort.[48]  And contrary to Alexion's suggestion, adjudicating the reasonableness of its past conduct will not burden it with "perpetual Court monitoring of [its] developmental efforts over the next five years."[49]  In short, a "common sense assessment" of each parties' interests favor adjudicating Count I now.[50]

5.    For the foregoing reasons, Defendant's Motion is **DENIED**. Defendants' motion to stay discovery pending this order is also **DENIED** as moot.[51]

                                             _____
                                             */s/ Morgan T. Zurn*
                                             Vice Chancellor Morgan T. Zurn

---

[48] This consideration again links the considerations of accrual for purposes of the statute of limitations to the purpose of ripeness.  If SRS waited until the end of the seven-year period to claim Alexion breached its performance covenant in year two, Alexion could be heard to protest that claim was outside the statute of limitations, and that it had suffered the prejudice of lost evidence that motivates the timely adjudication of claims.

[49] D.I. 27 at 12.

[50] *See XI Specialty*, 93 A.3d at 1217.

[51] D.I. 60.