IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LG ELECTRONICS INC., | § | |
| | § | |
| Plaintiff Below, | § | No. 243, 2025 |
| Appellant/Cross-Appellee, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| INVENTION INVESTMENT | § | C.A. No. N22C-11-145 |
| FUND I, L.P., INVENTION | § | |
| INVESTMENT FUND II, LLC, | § | |
| INTELLECTUAL VENTURES I | § | |
| LLC, and INTELLECTUAL | § | |
| VENTURES II LLC, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees/Cross-Appellants. | § | |

Submitted: January 7, 2026
Decided: April 7, 2026

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS** Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Jeremy D. Anderson, Esquire, BAKER & HOSTETLER LLP, Wilmington, Delaware; Michael J. McKeon, Esquire, Christian A. Chu, Esquire, R. Andrew Schwentker, Esquire (*argued*), FISH & RICHARDSON P.C., Washington, D.C., *for Plaintiff Below, Appellant/Cross-Appellee LG Electronics Inc.*

Brian E. Farnan, Esquire, Michael J. Farnan, Esquire, FARNAN LLP, Wilmington, Delaware; Meredith Martin Addy, Esquire (*argued*), ADDYHART P.C., Atlanta, Georgia, *for Defendants Below, Appellees/Cross-Appellants, Invention Investment Fund I, L.P., Invention Investment Fund II, LLC, Intellectual Ventures I LLC,* and *Intellectual Ventures II LLC*.

**TRAYNOR**, Justice:

This appeal involves a breach of contract action between parties to a patent license agreement. The licensee sued the licensor in the Superior Court, alleging that the licensor's lawsuits in Texas against two of the licensee's customers breached the license agreement. The licensee alleged that the Texas lawsuits gave rise to an obligation on its part to indemnify its customers for the cost of defending and settling the licensor's lawsuits. The licensee sought damages in the amount of that indemnification obligation. At the close of a week-long trial, the jury agreed with the licensee and returned a verdict in its favor.

Neither side is content with the judgment entered by the trial court following the jury's verdict. The licensor believes that the products involved in its lawsuits against the licensee's customers are not covered by the license agreement and that, even if they are, the licensee did not prove at trial its entitlement to damages. The licensee contends that the trial court improperly applied a contractual damages limitation to the jury's verdict and erroneously denied its request for an award of prejudgment interest and costs.

As we explain in this opinion, we conclude that the licensor's arguments lack merit. We conclude further that the trial court was correct to apply the contractual damages cap but that it erred in applying it in the manner advocated by the licensor for the first time on the eve of trial. And finally, we agree with the licensee that the

2

trial court's denial of its motion for an award of prejudgment interest and costs should not stand. We thus affirm the Superior Court's judgment in part, reverse it in part, and remand so that the court can amend its judgment in accordance with our decision.

I

A

LG Electronics Inc. is a company organized under the laws of the Republic of Korea. Although known for its consumer electronics products, LG also makes motor vehicle components, including telematics units. Telematics units equip vehicles with cellular, GPS, Wi-Fi, and mobile hotspot capabilities.

Invention Investment Fund I, L.P., Invention Investment Fund II, LLC, Intellectual Ventures I LLC, and Intellectual Ventures II LLC (collectively, "IV"), are Delaware entities that acquire patents. Through those acquisitions, IV gains the rights associated with the use of the patents. IV profits by selling the right to use those patents through license agreements. If IV's patented technology is used without its permission, IV can assert its patent rights by suing for patent infringement.

In 2016 and 2017, IV sued LG's customers in Germany, alleging patent infringement, based on, among other things, their use of LG's electronics products. LG was not a party to these lawsuits, but the suits triggered LG's indemnification

obligations to its customers. To resolve the lawsuits and protect against future liability—in the words of LG's corporate witness, Hongsun Yoon, "to secure[] patent peace"—LG entered into a Patent License Agreement with two entities that were at the time related to IV: IV International Licensing ("IVIL") and Intellectual Ventures-Invention Investment Ireland ("III").[1] For LG, the "patent peace" it secured by entering the License Agreement meant that it could "make products, sell products, use products, but also . . . protect[] [its] customers for their use of [its] products under all of IV's patents."[2]

The Agreement achieved this end but only to the extent that LG's products were "Licensed Offering(s)." Under § 1 of the Agreement, the term "Licensed Offering(s)" is defined as:

> all of [LG's] . . . current and future products, processes, services or technologies that are:
>
> > (a) made or used by [LG] . . .; or
> >
> > (b) provided to [LG] . . . by a third party . . . and sold or distributed by [LG] . . . under a mark or trade indicia of [LG] . . . .[3]

A specific category of products, "Foundry Products," is excluded from the definition of "Licensed Offering(s)," meaning that the license does not cover

> products manufactured by [LG] . . . for or on behalf of a third party, solely according to such third party's proprietary design specifications,

---

[1] App. to Opening Br. at A437.
[2] *Id.*
[3] *Id.* at A211.

for delivery to or on behalf of such third party, whereby such third party sells or distributes such products as its own products under its own mark or trade indicia.[4]

Thus, a product that is not a Licensed Offering may be the subject of a patent infringement action brought by IV.

Under the Agreement, LG paid a "License Fee," which is defined under § 5.1 as $12,800,000 USD.[5]  The "License Fee" consisted of two payments—one to IVIL and the other to III—as identified in subsections (A) and (B) to § 5.1:

> (A) IVIL Payment: 38.38% of the License Fee; Four Million Nine Hundred Twelve Thousand Five Hundred Fifty-one United States Dollars and Eight Cents ($4,912,551.08USD) shall be paid, in United States Dollars, to IVIL ("***IVIL Payment***").
>
> (B) III Payment: 61.62% of the License Fee; Seven Million Eight Hundred Eighty-seven Thousand Four Hundred Forty-eight United States Dollars and Ninety-two Cents ($7,887,448.92 USD) shall be paid, in United States Dollars, to III ("***III Payment***").[6]

LG and IV also agreed to a limitation-of-liability provision under § 9.6, which states:

> NO PARTY WILL BE LIABLE TO ANOTHER PARTY FOR INDIRECT DAMAGES, INCLUDING ANY LOST PROFITS OR OTHER INCIDENTAL OR CONSEQUENTIAL, EXEMPLARY OR SPECIAL DAMAGES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING OUT OF THIS AGREEMENT, INCLUDING THE USE OR INABILITY TO USE ANY PATENT OR PRODUCT, EVEN IF SUCH PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH

---

[4] *Id.* at A211–12.
[5] *Id.* at A215.
[6] *Id.*

DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE AGGREGATE LIABILITY FOR CLAIMS ARISING UNDER THIS AGREEMENT WILL NOT EXCEED THE LICENSE FEE RECEIVED BY A PARTY UNDER PARAGARPH [*sic*] 5.1 AS OF THE DATE THAT SUCH PARTY HAS BEEN NOTIFIED OF A CLAIM; PROVIDED, HOWEVER THAT THIS LIMITATION WILL NOT APPLY TO REDUCE OR OTHERWISE LIMIT THE AMOUNTS DUE AND OWING TO EACH LICENSOR UNDER THIS AGREEMENT, INCLUDING, UNDER SECTION 5. [7]

B

Two years after LG and IV entered the License Agreement, IV filed suits in Texas federal courts alleging that LG's telematics units used by General Motors LLC ("GM") and Toyota Motor Corporation infringed on patents of which IV was the rightful assignee. Discussions between LG and IV aimed at resolving these lawsuits were unproductive. LG expressed its view that the telematics units were "clearly licensed under the agreement."[8] IV disagreed, maintaining its suits against GM and Toyota until the suits settled; GM and Toyota each paid IV $15,000,000 and received a license to use IV's patents.

GM and Toyota independently demanded indemnification from LG for the expenses incurred defending and settling the Texas lawsuits. On October 29, 2021, Toyota sent LG a request for indemnification grounded in a 2016 agreement between Toyota and LG Electronics Japan Inc., titled the Basic Parts Supply Agreement. LG

---

[7] *Id.* at A220.
[8] *Id.* at A464.

was not a party to the Basic Parts Supply Agreement, but according to Yoon, another agreement entered in 2020—in which LG *was* a party—supplemented the Basic Parts Supply Agreement, establishing LG's indemnification obligation to Toyota. Toyota's 2021 letter did not specify the amount it sought from LG. GM sent a similar letter on July 22, 2022, along with an invoice, requesting indemnification for LG's "reasonable share of the legal fees/costs incurred by GM in the Intellectual Ventures (IV) patent infringement matter."[9]

On October 3, 2023, GM invoked the indemnification provision contained in GM's General Terms & Conditions—an unsigned document—as controlling "the exclusive terms and conditions under which LGE provid[ed] [the telematics units] to GM."[10] In its request, GM stated that nine out of the 12 patents at issue in the Texas case were provided by LG, so "GM believe[d] it [was] fair and reasonable for LGE to be responsible for 75% of the total cost to GM to defend and settle [the Texas case]."[11] Accordingly, GM requested $14,933,884 from LG, which represented 75% of GM's legal fees, costs, and settlement amount.

On October 25, 2023, Toyota sent another demand, seeking JPY 342,231,953, which converted to $2,300,000 USD under the then-applicable exchange rate, from LG.

---

[9] App. to Answering and Reply Br. at AR882–83.
[10] *Id.* at AR652.
[11] *Id.* at AR653.

## C

In November 2022—not long after GM and Toyota demanded indemnification—LG brought this breach of contract action against IV. LG alleged that IV breached three provisions of the License Agreement: § 2.1, which grants LG a license to use the Licensed Offerings; § 4.3(b), which grants a release to LG's customers; and § 9.4.6, under which IV promised not to "prevent or hinder [LG's] exercise . . . of the license rights granted under [the License Agreement]."[12] In its answer, IV raised a host of defenses, but at the core of IV's response was its allegation that the License Agreement did not apply to the products involved in its suits against Toyota and GM in the Texas federal courts.

After discovery, both parties moved for summary judgment, raising numerous issues, most of which are not relevant to this appeal. For the purposes of our review, we focus on two issues. The first was whether § 9.6 of the License Agreement imposed a limit as to the amount LG, if successful, could recover in damages. And the second was whether LG's telematics units constituted Foundry Products and thus were not Licensed Offerings under the Agreement.

## i

As to whether LG's damages were limited by § 9.6 of the License Agreement, IV argued for the first time in its "Motion for Summary Judgment on Damages" that

---

[12] App. to Opening Br. at A212, A214, A220.

§ 9.6 limited LG's recovery to the amount LG paid for the License Fee, $12,800,000. Because LG requested monetary relief that was significantly more than what it paid in license fees, IV contended that "[a]ny amount LG [sought] beyond its contractually limited damages must be rejected as a matter of law."[13] LG responded that § 9.6 operated as an affirmative defense and that, because IV failed to raise in its answers to LG's complaint or during discovery, it had waived the defense.

The Superior Court determined that § 9.6 of the License Agreement applied, which limited a party's aggregate liability to that of "the License Fee received by a Party."[14] Because § 5.1 of the agreement defined the term "License Fee" as $12.8 million, the court concluded that LG's "maximum recoverable damages from IV" could not exceed that amount.[15]

The court also rejected LG's argument that the damages cap was an affirmative defense, observing that "a damage limitation imposed by clear contractual language is not an affirmative defense."[16] The court noted that it "does not lightly set aside the clear contractual language parties' have negotiated, and LG has provided no basis for doing so here."[17] The court thus granted IV's motion for summary judgment as to this issue.

---

[13] *Id.* at A194 (citations omitted).
[14] Opening Br. Ex. A at 18–19; App. to Opening Br. at A220.
[15] Opening Br. Ex. A at 19.
[16] *Id.* at 18.
[17] *Id.* at 18–19.

IV also contested LG's breach of contract claim, arguing that the telematics units were Foundry Products, which, as mentioned above, § 1 of the License Agreement defined as "products manufactured by [LG] . . . for or on behalf of a third party, solely according to such third party's proprietary design specifications . . . ."[18] IV contended that LG's designated corporate technical witness "confirmed" that LG's customers "control the design of the telematic units," customizing the parts to fit the need of the customer's product.[19] IV also mentioned that the finished product bears the customers' logos, not LG's. So, in IV's view, the telematics units were Foundry Products and excepted from the License Agreement.

LG responded that the telematics units at issue were Licensed Offerings covered under the Agreement. LG claimed that it produced "over 20,000 pages of technical documentation" and pointed to deposition testimony that emphasized that "over 100 LG engineers work[ed] on the development of LG's telematics units[,]" "creating internal design documents that LG's customers (like GM and Toyota) cannot ordinarily access."[20] LG also produced photos that showed that the telematics units contained both its and its customers' brand labels on the products. Thus, from LG's point of view, the telematics units could not be Foundry Products

---

[18] App. to Opening Br. at A211–12.
[19] App. to Answering and Opening Br. at B170.
[20] *Id.* at B269–70.

because they were not manufactured "*solely* according to such third party's design specifications."[21]

The Superior Court agreed with LG's interpretation that a product falls under the Foundry Products definition only if the product is designed "solely"—meaning "'alone,' i.e. to the exclusion of all else"— "according to such third party's design specifications."[22] It then looked to the documents produced in discovery and found that "LG was heavily involved in all aspects of telematic unit design, exclusively controlling some aspects."[23] From this, the court concluded that the telematics units "were not made 'solely'" to Toyota or GM's design specifications and were therefore outside the ambit of Foundry Products.[24]

D

On October 9, 2024—less than a week before trial was to begin and well after the parties had filed the Pretrial Stipulation and Order—LG's counsel notified the court that "during the pretrial disclosure process," IV had raised "new theories . . . at the eleventh hour," requiring the court's attention.[25] Counsel reported that IV appeared to be arguing—for the first time—that the damages cap was

---

[21] App. to Opening Br. at A211–12 (emphasis added).
[22] Opening Br. Ex. A at 13 (citations omitted).
[23] *Id.* at 14.
[24] *Id.*
[25] Letter to the Superior Court, *LG Elecs. Inc. v. Invention Inv. Fund I*, N22C-11-145 (Del. Super. Ct. October 9, 2024), D.I. 351.

11

$4,912,551.08[26] and not, as it had argued during summary-judgment briefing, $12,800,000.  LG learned of IV's new take on the damages cap when, on October 7, IV provided LG with a proposed jury verdict form that stated:

> What amount has LG Electronics Inc., proven by a preponderance of the evidence to be reasonably certain, not to exceed the License Agreement's cap on damages of $4,912,551.08 million?[27]

The court addressed this issue at a pretrial status conference.  IV argued that § 9.6 of the Agreement limited its liability to, as stated in § 9.6, "the License Fee received by a Party under paragarph [*sic*] 5.1 . . . ."[28]  Under IV's interpretation of § 9.6, IV was only liable for the portion of the License Fee that an IV-related entity received from LG because, as mentioned above, under § 5.1 of the Agreement, two entities—III and IVIL—received payments.

Although there was no dispute that III and IVIL were IV-related entities when they entered the Agreement, by the time this dispute arose, IV purportedly was no longer affiliated with III, only with IVIL.  IV's counsel represented to the trial judge that "[III] is not part of IV."[29]  The consequence of that development, IV contended, was that it was now only liable for the amount that IVIL received, that is, $4.9

---

[26] Henceforth, we abbreviate this figure and refer to it at times as "$4.9 million."

[27] Proposed Verdict Form at 68, *LG Elecs. Inc. v. Invention Inv. Fund I*, N22C-11-145 (Del. Super. Ct. October 7, 2024), D.I. 345.

[28] App. to Opening Br. at A220.

[29] *Id.* at A568–69.

million. For LG to secure the balance of the License Fee, IV averred, LG was required to join III as a party and LG had not done so.

LG countered that the parties were bound by the court's earlier summary judgment decision in which the court concluded—consistently with what IV had argued—"that 'LG's maximum recoverable damages from IV under the License Agreement are $12.8 million.'"[30]

The Superior Court reserved until after the trial its decision as to whether LG's damages were further limited to $4.9 million. The court ruled the damages-cap issue would not be put before the jury, which could determine the amount of damages, if any, subject to post-trial reduction, if appropriate, by the court.

E

At trial, LG presented evidence of its indemnification obligations to GM and Toyota through Yoon. Yoon testified that the General Terms & Conditions controlled LG's obligation to pay for GM's litigation costs in the event GM was sued for patent infringement. Yoon acknowledged that the General Terms & Conditions was an unsigned agreement. Yoon emphasized, however, that LG understood that it owed GM payments when GM was subject to a lawsuit for using LG products. And LG did, in fact, make indemnification payments to GM for litigation expenses in

---

[30] Opening Br. Ex. B at 3.

other cases under the agreement. Because of IV's lawsuit in Texas against GM, Yoon believed that LG owed a debt to GM.

Additionally, Yoon testified as to LG's indemnification obligation to Toyota. He explained, as mentioned above, that a supplemental agreement to the Basic Parts Supply Agreement established LG's obligation to Toyota and that LG had acted in accordance with that agreement in other patent infringement actions brought against Toyota for using LG products.

LG introduced GM's and Toyota's October 2023 demand letters requesting indemnification from LG for the purpose of establishing the amount of damages IV caused LG. The Superior Court admitted those letters over IV's objection under the business-records exception to the rule against hearsay.[31] Yoon then testified that those letters established that the entire amount LG owed GM ($14,933,884) and Toyota ($2,300,000), combined, was $17,233,884. He admitted that LG had not yet paid those amounts to either indemnitee.

The jury returned a verdict in favor of LG, awarding $17,233,884 in damages.

F

The parties filed post-trial motions. The Superior Court's decisions on four of the motions—three from IV and one from LG—are contested in this appeal.

---

[31] Superior Court Proceeding Worksheet, *LG Elecs. Inc. v. Invention Inv. Fund I*, N22C-11-145 (Del. Super. Ct. Sept. 23, 2024), D.I. 329.

14

i

IV moved for judgment notwithstanding the verdict and for a new trial. In both motions, IV asserted, among other reasons, that no reasonable jury could have concluded that LG had an obligation to indemnify Toyota or GM; nor could a reasonable jury have concluded that LG proved its damages with sufficient certainty. The Superior Court rejected those arguments, citing the jury's consideration of the General Terms & Conditions as the basis of LG's obligation to GM and the supplemental agreement to the Basic Parts Supply Agreement as the document governing LG's obligation to Toyota. The court also noted Yoon's testimony about LG's "course of performance" under those agreements. Specifically, the court explained that LG historically reimbursed GM and Toyota for the costs associated with defending against patent infringement actions because of their use of LG technology. Additionally, the court held that the indemnification letters supported the jury's award of damages. The court consequently denied IV's request that it set aside the verdict and enter judgment in favor of IV or grant IV a new trial.

ii

IV also renewed its argument that § 9.6 of the License Agreement limited IV's monetary liability to $4,912,551.08, the IVIL Payment, which would result in a further reduction of LG's recovery. LG countered that the doctrines of judicial estoppel and law of the case barred the court from considering IV's belated

15

argument. LG also contended that the pretrial stipulation, which was entered as an order, evidenced the parties' understanding that the only damages limitation in place was set at $12,800,000. To deviate from that understanding, in LG's view, would be improper.

The Superior Court rejected LG's arguments and accepted IV's interpretation of § 9.6. The court held that IV's liability was limited to the IVIL payment, reducing LG's recovery from $17,233,884 to $4,912,551.08.

iii

As the prevailing party at trial, LG moved for an award of costs, pre- and post-judgment interest, and attorney fees. The Superior Court granted only the request for post-judgment interest. In denying LG's request for costs, the court concluded costs were incidental damages within the meaning of the limit-on-liability provision in § 9.6. As to pre-judgment interest, the court acknowledged LG's right to such interest but "decline[d] to exercise its discretion to award . . . prejudgment interest,"[32] concluding that a pre-judgment interest award would result in a windfall to LG. And the court determined that an attorney-fee award was not warranted because the record did not support LG's allegation that IV litigated in bad faith.

---

[32] Opening Br. Ex. C at 9.

G

In this appeal, LG presses three arguments.  First, LG attacks the Superior Court's summary judgment and post-trial decisions imposing damages caps. Second, LG claims that the Superior Court erred by not awarding it pre-judgment interest, which LG believes it is owed as a matter of right.  Third, LG argues that the Superior Court erred in denying it costs.

In its cross-appeal, IV raises three issues.  First, IV argues that the Superior Court erred in determining that LG's telematics units were not Foundry Products, an exception to the Licensed Offerings covered under the Licensing Agreement. Second, IV believes that LG failed to prove damages with sufficient certainty.  Third, IV argues that LG had an unripe breach of contract claim and that LG purportedly failed to show that it had indemnity obligations to its customers, Toyota and GM.

II

If we were to decide any of the issues IV has raised in its favor, our review of LG's arguments would then be unnecessary.  Thus, we take up IV's arguments on cross-appeal first.

A

IV argues that the Superior Court on summary judgment erroneously held that the telematics units were not excluded from the Licensed Offerings, broadly defined in the Agreement as "all of" LG's "current and future products . . . that are . . . made

17

or used by [LG] . . . or provided to [LG] by a third party pursuant to a written agreement and sold or distributed by [LG] under a mark or trade indicia of [LG]."[33] IV offers a competing interpretation, asserting that the units are Foundry Products, which are "products manufactured by [LG] . . . for or on behalf of a third party, solely according to such third party's proprietary design specifications[.]"[34] Foundry Products, as we have noted, are not covered by the Licensing Agreement. Our reading aligns with the Superior Court's: the telematics units fall squarely under the category of Licensed Offerings.

Whether the telematics units are Foundry Products is a question of contract interpretation that we review *de novo*.[35] We begin our analysis by reading the License Agreement "as a whole and enforce the plain meaning of [its] clear and unambiguous language."[36] Consistent with the "objective theory of contracts, . . . a contract's construction should be that which would be understood by an objective, reasonable third party."[37] This means that when a contract is "'plain and clear on its face, . . . its language conveys an unmistakable meaning, [and] the writing itself is the sole source for gaining an understanding of [the parties'] intent.'"[38]

---

[33] App. to Opening Br. at A211.
[34] *Id.* at A211–12.
[35] *Thompson St. Cap. P'rs IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 340 A.3d 1151, 1165 (Del. 2025).
[36] *Id.* at 1166 (quoting *BitGo Hldgs., Inc. v. Galaxy Digital Hldgs., Ltd.*, 319 A.3d 310, 322 (Del. 2024)).
[37] *BitGo*, 319 A.3d at 322 (quoting *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014)).
[38] *Id.* (quoting *City Inv. Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

As we read it, the definition of the term Foundry Products conveys an unmistakable meaning. Foundry Products must be manufactured "solely according to [a] third party's propriety design specifications[.]"[39] The word "solely" plainly means "to the exclusion of all else" or "without another."[40] Reading these definitions together, we conclude that the telematics units are Foundry Products only if they are manufactured, "to the exclusion of all else," according to a third party's proprietary design specifications. Practically speaking, input into a product's design aside from a third party's proprietary specifications takes the product outside the scope of a Foundry Product.

Although LG's customers might retain a measure of control over the design of the telematics units, LG produced confidential technical documents evidencing its involvement in designing the units, which supports the Superior Court's determination that the telematics units design was a product of a collaborative process. We agree with the Superior Court that LG did not "blindly follow the design specifications of Toyota and GM" and that LG was "heavily involved in all aspects of telematic unit design, exclusively controlling some aspects."[41] LG's hand in

---

[39] App. to Opening Br. at A212.

[40] *Solely*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/solely (last accessed Mar. 30, 2026); *see also, e.g.*, *Husted v. A. Philip Randoph Inst.*, 584 U.S. 756, 768 (2018) ("'Solely' means 'alone'").

[41] Opening Br. Ex. A at 14.

19

designing the units therefore compels the conclusion that the units are not Foundry Products.

IV's competing interpretation is unpersuasive. IV invites us to review extraneous evidence, such as its expert's witness's opinion on how the industry understands the meaning of Foundry Products. But because the definition of Foundry Products as set forth in the Agreement is "plain and clear on its face," we need not stray beyond the Agreement itself as "the sole source for gaining an understanding of [the parties'] intent."[42] We therefore concur with the Superior Court that the telematics units are not Foundry Products.

B

As mentioned above, Superior Court denied IV's motion for judgment notwithstanding the verdict because it determined, among other things, that a reasonable jury could conclude that LG sufficiently proved its damages. IV challenges that decision on three grounds.

First, IV argues that the only evidence of the amount of LG's indemnification obligations to GM and Toyota—demand letters from those entities—was admitted for the limited purpose of establishing that LG put IV on notice of its indemnification claims and not to prove damages. Second, even if the demand letters were

---

[42] *BitGo*, 319 A.3d at 322 (quoting *City Inv. Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191 (Del. 1993)).

admissible to show LG's damages, according to IV, they were insufficiently corroborated. Third, IV claims that LG's damages were too speculative to support the jury's award.

Under the Delaware Constitution, "on appeal from a verdict of a jury, the findings of the jury, if supported by evidence, shall be conclusive."[43] Following this principle, this Court has held that a jury's damages verdict "is presumed to be correct and 'will be upheld unless it is against the "great weight of the evidence.""'[44] To the extent that IV has challenged the trial court's admission of damages evidence, we review the court's evidentiary rulings for abuse of discretion.[45]

i

IV argues that "LG presented no evidence to support the value (or any value) of its damages."[46] Hence, by IV's lights, the Superior Court erred by not granting its motion to enter judgment notwithstanding the verdict. According to IV, LG's evidence of damages—Toyota's and GM's demands for indemnification—were admitted for the purpose of showing that LG was on notice of the requests, not for the purpose of proving damages. Because the jury awarded LG the amount specified in those demand letters, IV believes that the jury improperly considered those letters

---

[43] Del. Const. art. IV, § 11(a)(1).
[44] *Mitchell v. Haldar*, 883 A.2d 32, 43 (Del. 2005) (quoting *Walker v. Shoprite Supermarkets, Inc.*, 859 A.2d 620, 622 (Del. 2004)).
[45] *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1183 (Del. 2000).
[46] Answering and Opening Br. at 50.

21

for the truth of the matter asserted and that the court failed to correct that error by not setting aside the verdict.

We review the Superior Court's decision denying IV's motion for judgment notwithstanding the verdict by "appl[ying] the same standard that controls the trial court."[47] That means that "[t]he evidence of [the] record must be viewed in a light most favorable to [the] plaintiff, the non-moving party; and the trial judge must determine whether under any reasonable view of the evidence, the jury could justifiably find in favor of the plaintiff and against the defendants."[48] Consequently, a jury verdict will not be set aside if there is "any competent evidence upon which the verdict could reasonably be based."[49]

Contrary to IV's interpretation of the record, the Superior Court did not admit the two demand letters for the limited purpose of establishing notice. On this point, IV conflates the admission of a separate document—PTX-496 (a letter from GM notifying LG of IV's lawsuit against it in Texas)—with the demand letters marked as PTX-469 and PTX-485. LG acknowledges that PTX-496 was expressly not offered to prove the truth of its contents but to demonstrate that LG had been provided notice of IV's lawsuit against GM. By contrast, the demand letters—PTX-

---

[47] *Mercedes-Benz of N. Am. Inc. v. Norman Gershman's Things to Wear, Inc.*, 596 A.2d 1358, 1362 (Del. 1991) (citing 9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2536 (1971)).
[48] *Id.* (citing *Moody v. Nationwide Mutual Ins. Co.*, 549 A.2d 291, 292–93 (Del. 1988)).
[49] *Id.* (quoting *Turner v. Vineyard*, 80 A.2d 177, 179 (Del. 1951)).

469 (Toyota's indemnification demand letter) and PTX-485 (GM's indemnification demand letter)—contained the indemnification amounts GM and Toyota respectively requested from LG. The Superior Court concluded that these demand letters were not prepared in anticipation of litigation and could be admitted over a hearsay objection under Delaware Rule of Evidence 803(6)'s business-records exception.[50] So at trial, LG introduced those demand letters as evidence of its damages in addition to testimony provided by LG's corporate representative, Yoon, confirming the amount of damages LG suffered. We therefore conclude that the jury's award is supported by "competent evidence upon which the verdict could reasonably be based."[51]

ii

IV next argues that LG's evidence of damages—the GM and Toyota indemnification demand letters—was insufficiently corroborated. According to IV, the indemnification demand letters did not contain adequate detail or back-up documentation showing how the requested indemnification was "proximately connected, if at all, to IV's alleged breach of the Agreement with LG."[52]

---

[50] IV has not appealed this aspect of the trial court's evidentiary ruling, so we do not pass judgment on it.

[51] *Mercedes-Benz*, 596 A.2d at 1362 (quotation omitted).

[52] Answering and Opening Br. at 50.

Consequently, IV asks us to "rule as a matter of law that LG's damages evidence was insufficient to submit to the jury, much less to support the jury's verdict."[53]

Other than citing our decision in *LCT Cap., LLC v. NGL Energy Partners LP*,[54] IV does not explain how the purportedly deficient corroboration undermines the admissibility of the letters. It is true, as IV contends, that "[w]here there is no corroboration or supporting documentation [of damages], it is error to send that evidence to the jury."[55] But *LCT* does not stand for the proposition that a document evidencing damages must necessarily be supported by other corroborating documents as a condition of admissibility. Instead, in *LCT*, we determined that the Superior Court erred in allowing LCT's fraud claim to be submitted to the jury because LCT did not present evidence of its fraud damages independent of that used to support its claim for *quantum meruit* damages. *LCT* turned on whether, under the circumstances of that case, each theory of damages was supported by evidence that is independent of the other. *LCT*, quite simply, does not support IV's argument that the challenged evidence was inadmissible.

IV's separate argument that, because of the absence of corroborating documents, the jury's damages verdict was unsupported by the evidence is unavailing. For starters, IV's argument on this point is conclusory, offering nothing

---

[53] *Id.*
[54] 249 A.3d 77, 98 (Del. 2021).
[55] IV's Answering and Opening Br. at 51.

24

more than the misguided citation of *LCT*. At bottom, IV is asking the Court—as it asked the trial court in its post-trial motions—to weigh the evidence in its favor. Like the trial court, we conclude that the evidence, including the relevant indemnification agreements, the correspondence from Toyota and GM, and Yoon's testimony, was sufficient to allow LG's case to go to the jury. As the trial court noted, IV had ample opportunity during discovery to ascertain how the indemnification demands were apportioned. Likewise, IV's ability to cross-examine Yoon and call its own expert to critique LG's damages presentation was not hindered.

iii

IV also contends that LG's evidence of damages is speculative and, for this separate reason, the trial court should not have "allow[ed] the bald letters from GM and Toyota to go to the jury."[56] IV relies on *Interim Healthcare, Inc. v. Spherion Corp.*,[57] a Superior Court decision that this Court affirmed. The Superior Court in *Interim Healthcare* decided that the plaintiffs' claim for indemnification damages was flawed because the plaintiffs requested the entire amount they paid in a global settlement even though the indemnification agreement expressly limited the scope of indemnification to a lesser amount. Because the "[p]laintiffs made no effort to secure a breakdown or itemization of the specific claims" covered under the

---

[56] IV's Answering and Opening Br. at 54.
[57] 884 A.2d 513, 571 (Del. Super. Ct.), *aff'd*, 886 A.2d 1278 (Del. 2005).

indemnification agreement, the court declined to "attempt the extraction" and held that the damages were "too speculative and [were] not subject to 'a reasonable basis for computation.'"[58]

By contrast, here and as the Superior Court observed, "IV never argued that LG's indemnification obligations towards Toyota or GM were contractually limited such that an itemization was necessarily required."[59]   Thus, the Superior Court's decision in *Interim Healthcare* is inapposite.

In sum, IV's three-pronged argument that LG failed to prove its damages with sufficient certainty does not persuade us that the jury's verdict could not be reasonably based on the competent evidence LG presented at trial.

C

i

IV argues that, because GM and Toyota had not made their indemnification demands in writing before LG filed this action and LG has not paid either GM or Toyota in response to those demands, "LG's claims are not ripe for a decision."[60]

---

[58] *Id.*
[59] App. to Answering and Opening Br. at B1216 (quoting footnote 69).
[60] Answering and Opening Br. at 56.

This argument misapprehends the concept of ripeness as it applies to breach of contract claims.

We review whether a claim is ripe for adjudication, a question of justiciability, *de novo*.[61] In *XL Specialty Ins. Co. v. WMI Liquidating Trust*,[62] this Court explained our approach to the ripeness issue.

> A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form. Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static. Conversely, a dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention.[63]

Here, IV's actions that form the basis of LG's breach of contract claim occurred in 2021 when it filed suit against GM in the Western District of Texas and against Toyota in the Eastern District of Texas. Those lawsuits gave rise to LG's obligation to indemnify GM and Toyota. That is when LG's breach of contract claim accrued for statute-of-limitations purposes;[64] it follows that the claim was ripe.

---

[61] *See XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014).

[62] 93 A.3d 1208 (Del. 2014).

[63] *Id.* at 1217–18 (cleaned up).

[64] *Lehman Bros. Hldgs., Inc. v. Kee*, 268 A.3d 178, 185–86 (Del. 2021) ("A breach-of-contract claim 'accrues and the Statute begins to run at the time the contract is broken, not at the time when actual damage results or is ascertained.'" (quoting *Worrel v. Farmers Bank of State*, 430 A.2d 269, 472 (Del. 1981)).

27

In the same decision denying IV's motion for judgment notwithstanding the verdict, the Superior Court also rejected IV's argument that LG failed to establish at trial that it had indemnification obligations to Toyota and GM. IV challenges that decision, contending that the Superior Court should have set aside the verdict because the agreements LG cited as governing its indemnification obligations do not actually bind LG, the Korean company. Rather, according to IV, the real party subject to the indemnification obligations—which is also the party the letters requesting reimbursement address—is LG Korea's non-party subsidiary, LG Electronics U.S.A., Inc. And IV claims that it was error for the court to allow the jury to determine LG's obligations.[65] We review the Superior Court's decision denying IV's motion for judgment notwithstanding the verdict under the same standard articulated above.

At trial, LG presented competent evidence of its indemnification obligations to the jury. As to GM, the jury heard testimony from LG's corporate witness, Yoon,

---

[65] IV challenges the Superior Court's decision denying its motion for judgment notwithstanding the verdict because it contends that the court improperly allowed the jury to determine LG's indemnification obligations. The decision addressing this issue, however, is the Superior Court's denial of IV's motion for a new trial. The Superior Court determined that IV forfeited its argument that it was error to submit the determination of LG's indemnification obligations to the jury because IV "never raised this argument at trial or objected to the Court's submission of that question to the jury." App. to Answering and Opening Br. at B1226. IV does not rebut the Superior Court's forfeiture finding on appeal. We therefore deem the argument forfeited and decline to address it. Supr. Ct. R. 8.

that GM's General Terms & Conditions imposed an indemnification obligation on LG in the event that GM was sued for patent infringement. Although LG and GM did not execute the General Terms & Conditions, the jury considered Yoon's testimony that LG and GM were bound and acted accordingly when indemnification issues arose in other patent cases. IV does not now contest the admissibility of this evidence. The jury's verdict indicates that it credited Yoon's testimony and found that LG had an obligation to GM.

The jury also concluded that LG was obligated to indemnify Toyota. Yoon explained that LG's indemnification obligation stemmed from a 2020 agreement between LG and Toyota, which supplemented a 2016 agreement between LG's Japanese subsidiary and Toyota.[66] Like GM, Toyota received payments from LG when it was sued for patent infringement. This evidence was sufficient to support the jury's finding that LG was obligated to indemnify Toyota. Thus, the Superior Court did not err in leaving the jury's verdict intact.

---

[66] IV contends that even if the 2020 agreement applied, certain prerequisites of that agreement, such as Toyota giving LG control of the defense and resolution of IV's Texas lawsuit, were not satisfied. Because, in IV's view, LG did not present evidence of, among other things, evidence that it controlled the defense and resolution of the Texas lawsuit, "LG simply provided no proof of its indemnity obligations to Toyota." Answering and Opening Br. at 63. LG's corporate witness, Yoon, testified that LG's obligation did not arise out of the indemnification obligation tied to those prerequisites. Yoon stated that Toyota sought indemnification under the 2016 agreement, and because the 2020 agreement required LG to assume an indemnification obligation under the 2016 agreement, LG was required to indemnify Toyota.

To summarize our rulings on IV's arguments on cross-appeal: (1) the Superior Court did not err in its determination that the LG telematics units at issue are Licensed Offerings under the Agreement and not excepted as Foundry Products; (2) IV has not shown that any of the Superior Court's evidentiary rulings were an abuse of the court's discretion; (3) LG's breach of contract claim was ripe; (4) the jury's damages award is sufficiently supported by the evidentiary record; and (5) LG presented evidence sufficient to establish its indemnity obligation to GM and Toyota.

We turn, then, to LG's arguments.

## III

### A

As discussed earlier, the Superior Court issued a summary-judgment decision capping LG's recovery at $12,800,000. The court accepted IV's argument that § 9.6 of the Agreement limited LG's recovery to $12,800,000 because § 9.6 of the Agreement provided that the "the aggregate liability for claims arising under this Agreement will not exceed the License Fee received by a Party . . . ."[67] On appeal, LG argues that § 9.6's damages limitation is an affirmative defense and, because IV did not raise it in its pleadings or during discovery, but only in one of its summary-judgment motions, it waived the defense. In consequence of this waiver, the trial court should not have, or so LG argues, considered the damages limitation at all,

[67] App. to Opening Br. at A220.

30

including at the summary-judgment stage. If we were to agree, the jury's $17,233,884 verdict would stand. If, however, we find that § 9.6 is not an affirmative defense and the damages cap was not waived, LG contests the Superior Court's post-trial decision that further limited LG's recovery to $4,912,551.

The court grounded its further reduction in the damages cap in a revised interpretation of § 9.6. In its post-trial decision, the court changed its tune, determining that § 9.6, by limiting liability to "the License Fee received by a Party" under § 5.1 of the Agreement, limited IV's liability to the IVIL Payment, $4.9 million. In reaching this conclusion, the court accepted IV's representation that it was only affiliated with IVIL and no longer with the other recipient of the License Fee under § 5.1, that is, III. So the court reduced the jury's damages award from $17,233,884 to $4,912,551.

LG emphasizes here that the Superior Court erred because the court's summary-judgment ruling and the parties' pretrial stipulation locked in the cap at $12,800,000. LG insists further that the court's interpretation of § 9.6's provisions supports the Superior Court's initial decision on summary judgment instead of its post-trial interpretation, which limited LG's recovery to $4,912,551.

Whether a defense must be affirmatively pleaded under Superior Court Civil Rule 8(c) is a question of law and, as such, we review it *de novo*.[68]

Under Rule 8(b), "[a] party shall state in short and plain terms the party's defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies." Rule 8(c) states, "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense." Although this rule lists 18 defenses that fall within this mandate, the rule is not exhaustive. But the Rule does not provide guidance for differentiating an affirmative defense from a general denial under Rule 8(b).

We have not previously addressed whether Rule 8(c) applies to contractual damages limitations. Indeed, our caselaw discussing Rule 8's residuary clause— that is, the reference to "any . . . matter constituting an avoidance or affirmative defense"—is sparse. And none of the cases we have found provide us with guidance on the issue presented here.[69]

---

[68] *See Cheswold Vol. Fire Co. v. Lambertson Constr. Co.*, 489 A.2d 413, 420–22, 421 n.1 (Del. 1984), *on reargument* (Feb. 15, 1985) (analyzing whether a statute of repose is an affirmative defense).

[69] *See, e.g.*, *Health Sols. Network, LLC v. Grigorov*, 12 A.3d 1154, 2011 WL 443996, at *2 n.15 (Del. Feb. 9, 2011) (TABLE) (determining that the defendant-below/appellant bore the burden of producing evidence as to its affirmative defense of payment); *Cannelongo v. Fid. Am. Small Bus. Inv. Co.*, 540 A.2d 435, 440 & n.4 (Del. 1988) (concluding that the defendant waived the right to raise a statute of limitations defense); *Cheswold*, 489 A.2d at 420–22, 421 n.1 (declining to construe a statute of repose as a statute of limitations within the meaning of Superior Court Rule 8(c)); *Jeffery v. Seven Seventeen Corp.*, 461 A.2d 1009, 1011 (Del. 1983) (concluding that the

Federal courts have wrestled with the question whether Federal Rule of Civil Procedure 8(c) applies to certain defenses, but, according to one respected treatise, the range of Rule 8(c)'s residuary clause remains "uncertain."[70] The United States Court of Appeals for the Third Circuit, however, provides an instructive framework.[71] In *In re Sterten,* in deciding whether the Truth in Lending Act's tolerance-for-error provision was an affirmative defense subject to Federal Rule 8(c), the Third Circuit noted the distinction between a general defense and an affirmative one:

> When we are asking whether a particular defense is an affirmative defense, what we are really asking is whether that defense is adequately asserted merely by denying the allegations made in the complaint, or whether more is required. To answer that question, we need to determine whether the defense notes issues not raised, even by implication, in the complaint.[72]

Noting that "focusing solely on the relationship between the defense and the plaintiff's cause of action is of limited use," the court turned to "what Rule 8(c) is

---

defendant's affirmative defense of unconscionability was not pleaded in its answer and could not be raised on appeal).

[70] 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1271 (4th ed. 2026).

[71] We note that this framework has also been expressly adopted by the Tenth Circuit. *In re ZAAG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1231 (10th Cir. 2016) ("Moreover, we agree with the Third Circuit that in determining whether an issue should be treated as an affirmative defense for purposes of pleading, the critical question (absent a contrary command by statute or rule, such as the list of affirmative defenses in Rule 8(c)) is whether requiring the defendant to plead the matter is necessary to 'avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed.'" (quoting *In re Sterten*, 546 F.3d 278, 285 (3d Cir. 2008)).

[72] *Sterten*, 546 F.3d at 284.

intended to avoid."[73]  The purpose of the rule, the court explained, "is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed."[74]  So the court framed the analysis as follows:

> [T]he proper focus of our inquiry [is] whether, given what [the plaintiff] was already required to show, [the defendant's] failure to raise the tolerance issue specifically deprived [the plaintiff] of an opportunity to rebut that defense or to alter her litigation strategy accordingly.[75]

In applying that framework, the court determined that the plaintiff was not prejudiced by the defendant's failure to raise the tolerance issue as an affirmative defense.  The court reasoned that

> [t]he analysis a plaintiff must undertake to show *any* undisclosed finance charges under the Truth in Lending Act—that there were discrepancies between what was charged and what was disclosed in the Truth in Lending Disclosure Statement, and that those undisclosed fees fall within the Act's definition of a "finance charge"—is the same analysis required to show that the undisclosed charges exceeded § 1605(f)'s range of error.[76]

The court therefore concluded that the plaintiff could not have suffered any prejudice and allowed the defense.

The framework in *Sterten* fits the bill here.  The damages cap is not an affirmative defense expressly identified in Rule 8(c).  The issue of the amount of

---

[73] *Id.* at 284–85.

[74] *Id.* at 285 (first quoting *Robinson v. Johnson*, 313 F.3d 128, 134–35 (3d Cir. 2002) and then citing *Ingraham v. United States*, 808 F.2d 1075,1079 (5th Cir. 1987)).

[75] *Id.*

[76] *Id.* (emphasis in original).

LG's damages was certainly raised in the complaint, and LG's burden during discovery and at trial was not altered by the invocation of the damage's limitation defense at summary judgment. It follows that, unless LG was prejudiced by IV's invocation of the damages cap at summary judgment, the defense need not have been affirmatively pleaded by IV.

As to prejudice, LG makes a generalized claim that the timing of IV's raising of the damages-cap defense deprived it of an opportunity to seek discovery and tailor its litigation strategy. LG does not explain in any detail what it might have done differently in discovery had IV pleaded the defense in its answer to the complaint. Thus, we discern no prejudice and conclude that the trial court did not err in considering the issue in connection with IV's summary-judgment motion. IV's 11th-hour introduction of the $4.9 million damages cap is a different story. Even when a defense need not be affirmatively pleaded, if it injects a new factual issue into a case on the eve of trial, it may come too late. We consider that next.

ii

As mentioned above, days before trial was scheduled to begin, IV, having argued in support of its motion for summary judgment that § 9.6 "limits the amount LG can seek [] to the amount it paid in license fee, i.e., $12.8 million,"[77] altered its position and now claimed that LG's damages were "not to exceed the License

---

[77] App. to Opening Br. at A194.

35

Agreement's cap on damages of $4,912,551.08 million[.]"[78]  LG cried foul and requested guidance from the court, voicing its concern "about [the] trial becoming a trial by ambush."[79]  At a status conference two days later, the court expressed alarm at the timing of the surfacing of the issue but chose to defer consideration of it until after trial.

After the jury returned a verdict in favor of LG in the amount of $17,233,884, IV offered its new interpretation of § 9.6, which, if adopted, would further limit LG's recovery not at the previously established $12,800,000 level but to $4,912,551.08. IV's new interpretation was anchored in the premise that the Agreement treated two entities differently, one of which—IVIL—was the only entity that IV assumed the liabilities of in this litigation.

To facilitate the reader's understanding of this critical issue, we reproduce the text of § 9.6:

> NO PARTY WILL BE LIABLE TO ANOTHER PARTY FOR INDIRECT DAMAGES, INCLUDING ANY LOST PROFITS OR OTHER INCIDENTAL OR CONSEQUENTIAL, EXEMPLARY OR SPECIAL DAMAGES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING OUT OF THIS AGREEMENT, INCLUDING THE USE OR INABILITY TO USE ANY PATENT OR PRODUCT, EVEN IF SUCH PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  NOTWITHSTANDING ANYTHING TO THE

---

[78] Proposed Verdict Form at 68, *LG Elecs. Inc. v. Invention Inv. Fund I*, N22C-11-145 (Del. Super. Ct. October 7, 2024), D.I. 345.
[79] Letter to the Superior Court, *LG Elecs. Inc. v. Invention Inv. Fund I*, N22C-11-145 (Del. Super. Ct. October 9, 2024), D.I. 351.

CONTRARY IN THIS AGREEMENT, THE AGGREGATE LIABILITY FOR CLAIMS ARISING UNDER THIS AGREEMENT WILL NOT EXCEED THE LICENSE FEE RECEIVED BY A PARTY UNDER PARAGARPH [sic] 5.1 AS OF THE DATE THAT SUCH PARTY HAS BEEN NOTIFIED OF A CLAIM; PROVIDED, HOWEVER THAT THIS LIMITATION WILL NOT APPLY TO REDUCE OR OTHERWISE LIMIT THE AMOUNTS DUE AND OWING TO EACH LICENSOR UNDER THIS AGREEMENT, INCLUDING, UNDER SECTION 5. [80]

IV argued that § 9.6 of the Agreement recognized this distinction between IVIL and III because it stated that "the aggregate liability for claims arising under this Agreement will not exceed the License Fee received *by a Party* under paragarph [*sic*] 5.1."[81]   And because § 5.1 of the Agreement identified IVIL as receiving $4,912,551.08 of the License Fee, IV contended that its liability was limited to the payment IVIL received.

LG countered with four reasons why it was improper for the Superior Court to consider IV's new damages cap argument at the post-trial stage.  First, LG contended that the court was judicially estopped from doing so because IV's argument was inconsistent with the damages-limitation argument that IV raised and the court relied upon by the court at the summary-judgment stage.  Second, LG stated that the law-of-the-case doctrine required the court to adhere to its initial damages-limitation ruling on summary judgment.  Third, LG claimed that the parties entered

---

[80] App. to Opening Br. at A220.
[81] *Id*. (emphasis added).

a pretrial stipulation with the understanding that any damages award would be limited to no less than $12,800,000.  Fourth, LG argued that the License Agreement did not distinguish parties in the manner that IV claimed.

For LG, a plain reading of § 9.6 supported the interpretation that damages were limited to the License Fee, which was defined in the Agreement as "$12,800,000USD."[82]  LG also submitted its competing interpretation of § 9.6 that treats IVIL and III as a single party.  In support of that interpretation, LG pointed out that the term "Party," as used in § 9.6, is defined to include the term "Licensor"; and "Licensor," as defined in the preamble, means "IVIL and III together."[83]  Under LG's reading of § 9.6, there is no distinction between the entities, causing IV to be on hook for up to the License Fee, $12,800,000.

The Superior Court rejected LG's arguments and adopted IV's interpretation of § 9.6, further limiting LG's recovery from $12,800,000 to $4,912,551.08.  LG challenges that decision and makes these same arguments on appeal.

In our view, we need not resort to doctrines such as judicial estoppel and law of the case to conclude that the 11th-hour invocation of the $4.9 million damages cap came too late to be fairly entertained by the trial court.  A passage from the trial court's decision accepting the belatedly minted argument is telling:

---

[82] *Id.* at A215.
[83] *Id.* at A578.

At summary judgment, Defendants consistently argued that LG's damages are limited by § 9.6. While in a single instance Defendants stated Section 9.6 capped IV's potential liability, the Court's statements at oral argument shows it understood Defendants' theory regarding damages as the License Agreement *limits LG's damages* to fees paid, i.e., $12.8 million. Hence, the Summary Judgment Decision held that the License Agreement caps *LG's damages* at $12.8 million. Defendants took no position, and the Court made no ruling, concerning Defendants' maximum liability.[84]

The distinction the court drew between a limitation on LG's damages and IV's maximum liability was offered as the reason why IV was not judicially estopped from asserting the lower damages cap. We need not determine whether it serves that purpose effectively. We quote the statement because it appears to have served as the court's justification for allowing IV to raise the argument so late in the game. For that purpose, it is, in our view, wanting.

In the first place, the court's review of IV's position during the course of the litigation is incomplete. For instance, it fails to mention that in the pretrial stipulation, IV asserted that "[i]n the License Agreement, the parties agreed that, in the event of a breach of the Agreement, $12.8 million is the maximum allowable *recovery*."[85] A recovery is only available from a party who is liable. But more than that, the court's reliance on the fine distinction between damages and liability renders IV's summary-judgment motion on damages with its assertion of a $12.8

---

[84] Opening Br. Ex. B at 7–8 (cleaned up).
[85] App. to Opening Br. at A340 (emphasis added).

39

million damages limitation an empty exercise. Why, we are impelled to ask, would IV ask the court to recognize the $12.8 million damages cap if it believed that its liability was limited to $4.9 million? In short, we are not persuaded that IV's belated pitch for the $4.9 million cap was not retreading ground already trod at summary judgment and in the pretrial stipulation.

But the most compelling reason for reversing the Superior Court's ruling on this issue is the prejudice LG suffered as the result of IV's late disclosure of its new interpretation of § 9.6. In this regard, we view each of the parties' interpretations as reasonable. And there's the rub. When contending parties tender reasonable conflicting interpretations of a contractual provision, we recognize the provision as ambiguous.[86] Ambiguities are typically resolved with the aid of extrinsic evidence, which the parties develop through discovery and present at trial. But, because IV did not raise its competing interpretation until the eve of trial, LG was deprived of the opportunity to muster the extrinsic evidence that would support its interpretation or to join III as a defendant. In consequence, it was substantially prejudiced by IV's belated disclosure of its interpretation. Said another way, unlike at the summary-judgment stage when IV first raised its damages-cap defense based on § 9.6, the *existence* of which could not be disputed as a factual matter, IV's shift in its

---

[86] *Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276–77 (Del. 2025) ("Language is ambiguous if it is susceptible to more than one reasonable interpretation." (quoting *Manti Hldgs., LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)).

40

*interpretation* of § 9.6 gave rise to new factual issues to be sorted out without giving LG—or the court—sufficient time for the sorting. Under these circumstances, the trial court's consideration of the $4.9 million damages-cap argument was an abuse of discretion.

In reaching this conclusion, we recognize that the trial court did not view § 9.6 as ambiguous. Thus, presumably, had the court considered the issue in a pretrial setting, it would have deemed additional discovery unnecessary. But this procedural conundrum was not of LG's making, and it should not be penalized for IV's dilatory litigation tactic. For these reasons, we reverse the Superior Court's application of the $4.9 million damages cap and direct entry of judgment in LG's favor in the amount of $12,800,000.

B

LG, as the prevailing party at trial, moved for an award of prejudgment interest. The Superior Court, however, "decline[d] to exercise its discretion to award LG prejudgment interest,"[87] reasoning that, because LG "functioned like a pass-through entity" and was not deprived of any funds, an award of prejudgment interest

---

[87] Opening Br. Ex. C at 9.

41

would inappropriately grant LG a windfall.[88] We review LG's appeal of the Superior Court's denial of prejudgment interest *de novo*.[89]

In Delaware, prejudgment interest is awarded as a matter of right, not by judicial discretion.[90] Even so, citing *Summa Corp. v. Trans World Airlines, Inc.*,[91] the Superior Court invoked its purported discretion in denying LG prejudgment interest. The court's reliance on *Summa Corp.* is misplaced. *Summa Corp.* does not hold that the Superior Court has discretion to award or deny prejudgment interest. Instead, it addressed the scope of the Court of Chancery's discretion acting as a court of equity to decide what rate of interest applies when awarding prejudgment interest.[92]

In defending the Superior Court's decision, IV cites no Delaware authority—and we are aware of none—that prejudgment interest is contingent upon the prevailing party's incurring out-of-pocket losses. The judgment reflects LG's damages as a result of IV's breach and those damages were suffered when IV's breach caused GM and Toyota to incur indemnifiable litigation expenses. We

---

[88] *Id.* at 9–10.
[89] *Chrysler Corp. (Delaware) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1037 (Del. 2003) (citing *Wilmington Country Club v. Cowee*, 747 A.2d 1087, 1091 (Del. 1999)).
[90] *Id.* ("Although pre-judgment interest is awarded as a matter of right, and not by judicial discretion, a party must affirmatively request this award.").
[91] 540 A.2d 403, 409 (Del. 1998).
[92] *Id.* ("While the legal rate of interest has historically been the benchmark for pre-judgment interest, a court of equity has broad discretion, subject to principles of fairness, in fixing the rate to be applied. In the Court of Chancery the legal rate is a mere guide, not an inflexible rule." (citations omitted)).

therefore reverse the Superior Court's decision on this issue and remand with instructions to award prejudgment interest to LG.[93]

C

LG also argues that the Superior Court erred in determining that § 9.6 of the Agreement, which provides that "no party will be liable to another party for . . . incidental . . . damages, however caused and on any theory of liability arising out of [the Licensing Agreement],"[94] precluded an award of costs. We agree.

Under Superior Court Rule 54(d), "costs shall be allowed as of course to the prevailing party upon application to the Court . . . unless the Court otherwise directs." Although whether to award costs typically is a matter of judicial discretion,[95] it does not appear in this instance that the trial court's denial of costs was the product of an exercise of discretion. Rather, the court determined that § 9.6 barred LG's recovery of costs.

As noted above, § 9.6 states, among other things, that "no party will be liable to another party for . . . incidental . . . damages."[96] Relying on *Peyton v. William C. Peyton Corp.*,[97] a 1939 opinion that pre-dates Rule 54, the court determined that

---

[93] The parties have not briefed the issue of precisely when prejudgment interest began to accrue. On remand, the trial court may consider that factual issue, along with any other factual issue that bears on an award of prejudgment interest.

[94] App. to Opening Br. at A220.

[95] *Donovan v. Del. Water and Air Res. Comm'n*, 358 A.2d 717, 722–23 (Del. 1976).

[96] App. to Opening Br. at A220.

[97] 8 A.2d 89 (Del. 1939).

43

LG's costs were incidental damages subject to § 9.6's exclusion. To be sure, *Peyton* observed that "[c]osts are allowances *in the nature* of incidental damages awarded by law to reimburse the prevailing party for expenses necessarily incurred in the assertion of his rights in court."[98] However accurate that statement might be, we do not believe that it supports the Superior Court's conclusion that costs *are* incidental damages subject to § 9.6's exclusion.

First of all, costs are not damages. "Damages," in its most general sense, is a term of art that "generally connotes payment in money for a plaintiff's losses caused by a defendant's breach of duty."[99] It was the jury's function to determine what, if any, damages LG proved at trial. The jury was so instructed,[100] and the jury verdict sheet directed the jury to assess "[the] amount of damages . . . proximately caused by IV's breach."[101] Secondly, the term "incidental damages" refers to compensation for "losses reasonably associated with or related to actual damages."[102] Costs awarded under Superior Court Civil Rule 54 do not fall within this definition. The costs bear no relationship to the actual damages the jury awarded; they are a product

---

[98] *Id.* at 91 (emphasis added). Later opinions have adopted *Peyton*'s description of costs as being "in the nature of incidental damages." *See, e.g.*, *In re Bracket Hldg. Corp. Litig.*, 2020 WL 764148, at *11 (Del. Super. Feb. 7, 2020); *Harrison v. Dixon*, 2015 WL 757819, at *5 (Del. Ch. Feb. 20, 2015); *Dewey Beach Lions Club v. Longacre*, 2006 WL 2987052, at *1 (Del. Ch. Oct. 11, 2006) (citation omitted).
[99] 22 Am. Jur. 2d Damages § 1 (2026).
[100] App. to Answering and Reply Br. at AR870.
[101] App. to Opening Br. at A420.
[102] *Incidental Damages*, Black's Law Dictionary (12th ed. 2024).

of LG's success on the merits. Because the Superior Court's denial of LG's motion for an award of costs was based on an erroneous interpretation of § 9.6, we reverse and remand for reconsideration of LG's motion.

IV

The judgment of the Superior Court is affirmed in part and reversed in part. We remand for entry of judgment, the calculation of prejudgment interest and the reconsideration of LG's motion for costs consistent with this opinion.